# EXHIBIT H

FILED

JUL 1 0 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, MAX REGULA, being duly sworn, state:

### I

### TRAINING AND EXPERIENCE

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7). I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. Prior to joining the FBI, I received my Juris Doctor degree in May 1985 from the University of Pittsburgh School of Law. That same year I joined the FBI as a Special Agent. In December 1985, I graduated the FBI Academy, where I received about four months of instruction on a variety of law enforcement topics, including criminal investigations, intelligence techniques, and forensic science.

2.      From 1985 to 1998, I served as an FBI Special Agent in San Diego, primarily assigned to violent crime, drug-trafficking, and Organized Crime Drug Enforcement Task Force (OCDETF) investigations. From 1998 until 2005, I served as the Supervisory Special Agent for the FBI Violent Crimes Task Force – Gang Group in San Diego. From 2005 until 2006, I served as a Supervisory Special Agent detailed to FBI Headquarters in Washington, D.C., where I worked in the Criminal Investigative Division, Counterintelligence Division, and the FBI's Office of the Chief Information Officer (related to computer engineering). In 2006, I returned to San Diego, where I became the Supervisory Special Agent for the Bank Robbery/Violent Crimes Squad. Later, I served as the Supervisory Special Agent for the Domestic Terrorism Squad, as well as the Joint Terrorism Task Force (JTTF).

3.      In September 2008, I began a one-year detail as a Special Assistant U.S. Attorney at the U.S. Attorney's Office for the Southern District of California, prosecuting a variety of federal crimes. From 2009 until the present, I have served as a Special Agent

1  in the Organized Crime Squad (and briefly on the Public Corruption Squad) in San Diego,

2  investigating organized crime and criminal enterprises.

3      4.    Since 2009 I have been involved in ongoing investigation of large sports-

4  betting and sports bribery organized crime rings, including serving as a case agent or co-

5  case agent on four long-term illegal gambling investigations. During these investigations,

6  I have used a variety of investigative techniques, including wiretaps, undercover

7  operations, search warrants, arrests, interviews, and financial and other data analysis

8  techniques, among others. I am well-versed in the language and techniques used by

9  illegal gambling organizations. I have interviewed persons involved with and operated

10  sources embedded in illegal gambling rings.

11      5.    Based on my training and experience, I have become familiar with the

12  methods utilized by criminal organizations to launder monetary instruments, conduct

13  illegal bookmaking operations, and smuggle bulk cash. I have also spoken with senior

14  agents, as well as other senior law enforcement officers, about their experiences and the

15  results of their investigations and interviews. I know that individuals engaged in illegal

16  bookmaking often require the use of a telephone facility to set up the times, places, and

17  manner for collecting gambling debts and paying out winnings, transmitting account

18  information to customers, and managing their bookmaking business. I know that illegal

19  bookmakers depend upon maintaining their extensive contacts. The telephone enables

20  bookmakers to maintain contact with sub-bookies,[1] criminal associates, co-conspirators,

21  and customers. I also know that illegal bookmakers sometimes use fraudulent

22  information, such as nominee names and false addresses, to subscribe to communication

23  facilities, especially cellular telephones, and frequently use communication facilities to

24  thwart law enforcement efforts to intercept their communications.

25

26

27  [1] A "sub-bookie" works directly under a bookie by setting up clients with betting
accounts and/or lines of credits. A "sub-bookie" can also pay out and collect winnings

28  from clients for their bookie.

LSTV-TIII-PLEAD-15MC0291-000152

6.     The following is based, among other things, on my own investigation, oral and written reports by other law enforcement officers, physical and electronic surveillance, interviews, subpoenaed and public records, database checks, confidential sources, telephone toll records, and trap and trace devices, records checks, and consensual recordings set forth below.  Since this Affidavit is being submitted for a limited purpose, I have not included every fact I know about this investigation.  I have set forth only facts necessary to establish the foundation for the requested Order.  Conversations are set forth in substance unless noted.  My interpretations of certain statements are set forth in brackets and are based upon my knowledge of this investigation, my training and experience, and conversations with senior law enforcement officers.  Dates and times are approximate.

## II

## TARGET TELEPHONES AND TARGET SUBJECTS

7.     This Affidavit supports an application for an order authorizing the continued interception of communications of Sanders SEGAL aka Sandy SEGAL, Stanley PENN aka Stan PENN, James TEAR, Jeffrey BURKE aka Jeff BURKE, Danny Ut HUYNH aka Danny HUYNH, Nam Thanh NGUYEN, Pablo Daniel Ballestero FRECH, Petter Magnus KARLSSON, Sydney SEGAL, Jan BEVERLEY, Ken KEO aka Ken Pheng KEO, Richard Ryan BUCHARDT aka Ryan BUCHARDT, David LEPPO aka Dave LEPPO, Bradford CHAPIN aka Brad CHAPIN, John THOMAS, Firmino FERREIRA aka Cully, Anthony SMITH aka Tony SMITH, Stephanie SEGAL, Maria McGAFFIGAN, Richard MORNEAU aka Dick MORNEAU, Terri CALDWELL, Domenic JOHNSON, Robert BIDDLE, Louis Ed SANCLEMEN, Leonard AREVALO, Enrique GARFIAS, Dave LNU, Bruce SLESNICK, Joel SOPER, Eric SMITH, Buddy WILKERSON, Kyle LNU, Carla LNU, David KENLEY aka Dave KENLEY, Minh NGUYEN,      Joseph SPATAFORE aka Joe SPATAFORE, Imad SAMOUNA aka Eddie SAMOUNA, Jason TAYLOR,    Arkan SOMO, Naseem SALEM aka Nick SALEM, and others as yet

3

unknown (collectively referred to as the "Target Subjects") to and from the following facilities:

Wire and Electronic Communications

a.      a Verizon cellular telephone bearing telephone number (619) 787-4205 (**TT#1/SEGAL**), subscribed to David Mikovich (now deceased), 4203 Collwood Lane, San Diego CA 92115, IMSI number 311480081074351, but used by Sanders SEGAL.

Wire Communications

b.      a TracFone Wireless cellular telephone, with service provided by AT&T, bearing telephone number (424) 345-0781 (**TT#3/SPATAFORE**), believed to be used by Joseph SPATAFORE.[2]

III

# CRIMINAL ACTIVITY AND CRIMINAL COMMUNICATIONS

8.      Based on the facts below, there is probable cause to believe: (1) one or more of the Target Subjects have committed, are committing, and will continue to commit, the following offenses enumerated in 18 U.S.C. § 2516, to wit: (a) conducting an illegal gambling business (18 U.S.C. § 1955); (b) transmission of wagering information (18 U.S.C. § 1084); (c) money laundering (18 U.S.C. §§ 1956-57); and (d) conspiracy to commit these crimes (18 U.S.C. §§ 371 and 1956(h))[3] (hereinafter the "Criminal

---

[2] Telephone records do not identify the subscriber associated with **TT#3/SPATAFORE**. Conversations intercepted to and from **TT#1/SEGAL** on May 9, 2015, and May 11, 2015, however, support that the user of **TT#3/SPATAFORE** is Joe SPATAFORE. During the May 9, 2015 intercepted conversation, the user of **TT#3/SPATAFORE** told **TT#1/SEGAL** that he planned to visit the LUCKY LADY the following Monday, i.e., May 11, 2015, in connection with a potential sale of the business. Sanders SEGAL responded by instructing him to introduce himself to Stan PENN again, "If I'm not there." The user of **TT#3/SPATAFORE** said, "I kind of know him [PENN]." SEGAL interrupted, saying, "I've said Joe Spatafore to him. They're interested." Furthermore, on the day of the anticipated visit to the LUCKY LADY, the user of **TT#3/SPATAFORE** called **TT#1/SEGAL** to ask SEGAL to introduce him to Stan PENN by saying, "You remember Joe."

[3] The Target Subjects also are under investigation for the following offenses:   (a) 18 U.S.C. § 666 (theft or bribery related to programs that receive federal funds);   (b)

4

1  Activity"); and (2) evidence concerning the Criminal Activity will be obtained through the
2  interception of wire and electronic communications to and from **TT#1/SEGAL** and wire
3  communications to and from **TT#3/SPATAFORE**.

4      9.      We have conducted significant investigation since April 14, 2015, when your
5  Affiant submitted an Affidavit in Support of continued wire and electronic interceptions
6  of **TT#1/SEGAL**; however, we have not met all of the goals of our investigation.
7  Continued   interception   of   **TT#1/SEGAL**   and   initiation   of   interceptions   of
8  **TT#3/SPATAFORE** will allow us to further meet the objectives of our investigation,
9  which include the following: (1) developing sufficient evidence to prosecute all of the
10 Target Subjects for the Criminal Activity; (2) determining and identifying the volume,
11 geographic scope (including possible international connections to Costa Rica, Hong Kong,
12 Sweden, Thailand, Canada,  and other foreign countries), and manner and means of the
13 Target Subjects' illegal bookmaking, and money laundering activities, including the
14 quantities of illegal gambling proceeds collected and laundered, and the ultimate
15 destination of the illegal gambling proceeds (in the United States and elsewhere); (3)
16 determining the identities and roles of accomplices, aiders and abettors, and co-
17 conspirators in the Criminal Activity; (4) identifying and developing sufficient evidence to
18 forfeit assets and/or accounts used to facilitate, or that constitute proceeds of the Criminal
19 Activity; (5) determining the location and source of resources used to finance the Criminal
20 Activity; (6) identifying the physical location of the Target Subjects and their co-
21 conspirators and associates; and (7) determining the use of violence or threats of violence
22 in the aid of the illegal bookmaking/gambling business.

23

24

---

25 18 U.S.C. § 1341 (mail fraud); (c) 18 U.S.C. § 1343 (wire fraud); (d) 18 U.S.C. § 1346;
26 (e) 18 U.S.C. § 1511 (obstruction of state or local law enforcement with intent to facilitate
   an illegal gambling business); (f) 18 U.S.C.  §  1952 (interstate and foreign travel or
27 transportation in aid of racketeering enterprises); (g) 18 U.S.C.  §  1962 (RICO); and (h)
28 conspiracy to commit those crimes.

LSTV-TIII-PLEAD-15MC0291-000155

10. It is further requested that the interceptions be authorized for a period not to exceed thirty days. Furthermore, it is requested that the aforesaid interceptions shall not automatically terminate when the criminal communications have been first obtained, but shall be allowed to continue until communications are intercepted that achieve the goals of this investigation. The goals of this investigation are set forth in paragraph 9.

## IV

## PRIOR APPLICATIONS

11. On June 24, 2015, agents checked the Electronic Surveillance (ELSUR) indices/record systems of the FBI, Drug Enforcement Administration (DEA), Immigrations and Customs Enforcement/Homeland Security Investigations (ICE/HSI), the United States Secret Service (USSS), and the United States Postal Inspection Service (USPIS). Other than the applications listed in **Appendix A**, attached hereto, I know of no other applications that have been made to any state or federal judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons or facilities specified in this affidavit.

12. On March 16, 2015, the Honorable Janis L. Sammartino, U.S. District Judge for the Southern District of California, authorized the initial interception of wire and electronic communications to and from **TT#1/SEGAL** and electronic communications to and from a telephone (619-245-3377) subscribed to and used by James TEAR. On April 14, 2015, Judge Sammartino authorized the continued interception of wire and electronic communications to and from **TT#1/SEGAL**. Authorization for these interceptions expired at approximately midnight on May 13, 2015. I hereby incorporate my prior Affidavits in Support of Application, dated March 16, 2015 and April 14, 2015, in this matter 15mc0291-JLS (hereinafter "AFF-1" and "AFF-2," respectively).

## V

### PROBABLE CAUSE TO CONTINUE INTERCEPTION OF TT#1/SEGAL AND TO COMMENCE INTERCEPTONS OF TT#3/SPATAFORE

13. As further described below, it is my opinion that there is probable cause to believe that Sanders SEGAL (hereinafter SEGAL) and Joseph SPATAFORE (hereinafter SPATAFORE), as well as other Target Subjects have committed, are committing, and will continue to commit the Criminal Activity, and that the interception of wire and electronic communications to and from **TT#1/SEGAL** and wire communications to and from **TT#3/SPATAFORE** will reveal the details of the Criminal Activity.

### A.   INTRODUCTION

14. This FBI investigation targets the LUCKY LADY,[4] a casino and cardroom owned by Stanley PENN. Sanders SEGAL (the user of **TT#1/SEGAL**), a long-time associate of Stanley PENN, frequents the LUCKY LADY and has accrued several convictions, including two felony convictions for illegal bookmaking.[5] As discussed

---

[4] "LUCKY LADY" refers to the Lucky Lady Casino & Card Room, 5526 El Cajon Blvd., San Diego, CA 92115. The LUCKY LADY is a police-regulated cardroom, under San Diego Municipal Code § 33.3901, et seq. As a result, the SDPD Vice Unit has extensive official records on the LUCKY LADY. For example, under San Diego Municipal Code § 33.3905, "Employees in cardrooms must obtain a work permit from the Chief of Police."

[5] According to court records, Sanders SEGAL was convicted in 1998 of aiding and abetting the collection of credit by extortionate means, in violation of 18 U.S.C. § 894(a), in case number 95CR1965-B in the U.S. District Court for the Southern District of California, a crime for which he received a 41-month sentence. In addition, according to a criminal history query, SEGAL was convicted in 1998 of bookmaking in violation of California Penal Code § 337a(1) in the Superior Court of San Diego, an offense for which he was sentenced to 16 months in prison. Court records further reflect that SEGAL was convicted in January 1983 of conspiring to distribute and to possess a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846, in case number 81-1429-G-Criminal in the U.S. District Court for the Southern District of California, a crime for which SEGAL received a 4-month custodial sentence. In addition, court records reflect that SEGAL was convicted in 1982 of unlawful use of a communications facility, in violation of 21 U.S.C. § 843(b), a crime for which he was ultimately sentenced to three

7

below, Sanders SEGAL is a bookmaker who, along with other Target Subjects, operates out of the LUCKY LADY.  Joseph SPATAFORE (the user of **TT#3/SPATAFORE**) is one of SEGAL's biggest betting clients who, on at least one occasion, has also acted as bookmaker for SEGAL.

15.    In connection with this bookmaking activity, I believe that Sanders SEGAL, Stanley PENN, Sydney SEGAL (son of Sanders SEGAL), and others launder money in violation of 18 U.S.C. §§ 1956 and 1957. As set forth below, the LUCKY LADY has had a longstanding practice of allowing sports bettors to leave their payments for losing wagers at the LUCKY LADY's money cage, the area in the LUCKY LADY where patrons of its legitimate activities can exchange money for chips and vice-versa. Doing so allowed the proceeds of illegal sports betting activity to be commingled with the LUCKY LADY's otherwise legitimate income.  Furthermore, as described below, Sydney SEGAL—who works the money cage at the LUCKY LADY—has been intercepted on multiple occasions discussing illegal sports wagers and agreeing to subtract or add multiple thousands of dollars to and from a "blue bag" whenever Sanders SEGAL so requests. In addition, as set forth below, Sanders SEGAL solicited another individual to open a joint bank account for the purpose of funneling Stanley PENN's sports betting funds through Costa Rica.  This account was opened in approximately December 2005 and remained active until approximately 2007 or 2008.  Moreover, PENN's more recent bank records from 2014 and 2015, as described below, show hundreds of thousands of dollars per month in cash deposits and withdrawals and hundreds of thousands of dollars in monetary transfers between twelve different accounts, activity that is consistent with attempts to conceal the origin of illegally generated cash proceeds. In summary, based on agent surveillance, information from confidential sources, consensually recorded conversations, intercepted communications, and bank records, as set forth below, as well

---

years in custody by the U.S. District Court for the Southern District of California in case number 82-0620-E-Criminal.

LSTV-TIII-PLEAD-15MC0291-000158

1   as my training and experience, I believe that one or more of the Target Subjects are
2   conducting a money laundering operation out of the LUCKY LADY.

3       16.   Furthermore, as set forth below, I believe that the bookmaking business
4   operating out of the LUCKY LADY constitutes an illegal gambling business, in violation
5   of 18 U.S.C. § 1955. Conducting, financing, managing, supervising, directing, or owning
6   a gambling business is a federal crime under 18 U.S.C. § 1955, provided that the gambling
7   business: (1) is illegal under state law; (2) involves five or more persons who conduct,
8   finance, manage, supervise, direct, or own all or part of such business; and (3) has been or
9   remains in substantially continuous operation for a period in excess of thirty days or has a
10  gross revenue of $2,000 in any single day. Based on my training and experience and the
11  evidence presented more fully below, I believe that there is probable cause that all of these
12  elements are met here. Bookmaking is illegal in California. CAL. PENAL CODE § 337a.
13  As set forth below, I believe that the illegal bookmaking business operating out of the
14  LUCKY LADY involves five or more persons, including Sanders SEGAL, James TEAR,
15  Jeffrey BURKE, Danny HUYNH, Nam Than NGUYEN, Stanley PENN, Sydney SEGAL,
16  Ken KEO, Minh NGUYEN, David LEPPO, Petter Magnus KARLSSON, Pablo Ballestero
17  FRECH, among others. Finally, as set forth below, I believe that there is probable cause
18  that the illegal gambling business operating out of the LUCKY LADY has been in
19  substantially continuous operation for more than 30 days, and has had gross revenue of
20  more than $2,000 in a single day.

21      17.   Based on my training and experience and the evidence presented more fully
22  below, I also believe that Sanders SEGAL and Joseph SPATAFORE have used
23  **TT#1/SEGAL** and **TT#3/SPATAFORE**, not only to place illegal bets on sporting events
24  in furtherance of the illegal bookmaking operation, but also to further their attempts to
25  bribe or illegally influence public officials in San Diego City government to change
26  existing San Diego laws that affect the LUCKY LADY.

27      18.   The remainder of this section proceeds as follows. Part B presents evidence
28  establishing the illegal gambling business being run out of the LUCKY LADY. Part C

LSTV-TIII-PLEAD-15MC0291-000159

1    puts forth evidence pertaining to how the proceeds from illegal gambling are being
2    laundered. Part D presents evidence regarding the bribery and potential public corruption
3    investigation. Part E summarizes how, based on my training and experience, the evidence
4    presented supports that **TT#1/SEGAL** and **TT#3/SPATAFORE** are being used in
5    connection with the Criminal Activity.

6                **B.     SELECTED EVIDENCE ESTABLISHING ILLEGAL SPORTS**
7                         **BOOKMAKING TRANSACTIONS**

8         19.    This Part presents evidence establishing that illegal sports bookmaking is
9    occurring at the LUCKY LADY. This evidence shows that this bookmaking activity
10   involves a number of individuals and stretches across a range of sports and types of bets.
11   The evidence in this section is divided into two sections. The first section describes
12   evidence received from, and sports gambling transactions entered into by, a confidential
13   source with Sanders SEGAL. The second section describes other evidence of sports
14   gambling transactions between SEGAL, betting clients, and others. The third section
15   describes evidence of sports gambling transactions between Sanders SEGAL and Joseph
16   SPATAFORE.

                      1.    Evidence of Sports Gambling transactions between CS-1 and
17                          Sanders SEGAL

18        20.    On December 18, 2013, SDPD Detective Dan Vile and I interviewed a
19   confidential source (CS-1)[6] about suspected illegal bookmaking activities occurring at the

_____

   [6]   I believe that CS-1 has provided credible and reliable information because, in
part, it has been corroborated by physical surveillance, consensual recordings, and phone
records. CS-1's background and prior activities with regard to this investigation are
described in detail in affidavits that Agent Max Regula submitted to the Court in
connection with this matter on March 16, 2015, and April 14, 2015. CS-1 has no criminal
record, according to a criminal history query. According to my review of FBI records, as
well as my recollections from handling CS-1 both in this investigation and in prior
investigations, CS-1 has been financially compensated by law enforcement for truthful
and reliable information in prior investigations as well as in the current investigation. For
his services both in this investigation and in other investigations, CS-1 has been paid a
total of approximately $39,477 since June 3, 2008. CS-1 is currently receiving a monthly
service payment of approximately $1,000 for his work on this investigation, and I have

                                        10

LUCKY LADY.  CS-1 stated that, based on his observations as a current customer and former employee of the LUCKY LADY, several LUCKY LADY employees were engaging in illegal bookmaking and were using an internet website to facilitate these illegal bets.  CS-1 estimated that illegal bets placed on NFL games totaled more than $10,000 per weekend.  CS-1 further stated that at least five bookmakers—including SEGAL, James TEAR, Jeffrey BURKE, Danny HUYNH, Minh NGUYEN, and Nam Than NGUYEN—have conducted illegal gambling activities out of the LUCKY LADY during the last year.[7]

21.   Since January 2015, CS-1 has placed a number of illegal sports bets with Sanders SEGAL both in person and over the phone, some of which are discussed in the paragraphs below.

22.   During a consensually recorded January 30, 2015 meeting at the LUCKY LADY,[8] CS-1 placed a bet with Sanders SEGAL that the New England Patriots would

---

informed CS-1 that there is the potential of a further monetary award at the end of the case, based on FBI policies. According to CS-1, Stanley PENN had promised to give CS-1 the management of the bar within the LUCKY LADY, but PENN in fact gave the management of the bar to Danny HUYNH. CS-1 was unhappy with this turn of events and believes that HUYNH and Jan BEVERLEY (the manager of LUCKY LADY's card room) convinced PENN to rent the bar to HUYNH.

CS-1 worked for a third-party provider of proposition player services that served as a "bank" at the LUCKY LADY, so CS-1 was at the LUCKY LADY on almost a daily basis for years up until about 2008 or 2009, according to CS-1. Furthermore, CS-1's ex-wife is a dealer at the LUCKY LADY, and CS-1 has continued to frequent the LUCKY LADY as a poker player, according to CS-1.

[7]   According to CS-1, Danny HUYNH was removed in the spring of 2015 from his position as manager of the bar at the Lucky Lady because he was accused of sexual harassment by a number of the female employees at the Lucky Lady.

[8]   Unless otherwise noted, all consensually recorded conversations and meetings were conducted with the single-party consent of either CS-1 or an undercover agent. All calls and text messages also have been verified by telephone records, recordings of intercepted communications, screen shots of text messages, or by an agent who was present when the number was dialed or the text message was exchanged.

11

defeat the Seattle Seahawks in the Super Bowl. If the Seahawks won, CS-1 would lose $1,650; and if the Patriots won, CS-1 would win $1,500. During a series of subsequent text messages with **TT#1/SEGAL**, CS-1 confirmed with SEGAL that the bet was a "pick em" bet, meaning that CS-1 was simply betting that the Patriots would win the Super Bowl, not that the Patriots would win by a certain margin or spread.

23. On February 1, 2015, immediately after the Patriots won the Super Bowl, CS-1 sent **TT#1/SEGAL** a text asking, "Can you believe that game?" **TT#1/SEGAL** responded via text, "Wow. I'll see you tomorrow if that's ok." Based on his experience with sports betting, CS-1 understood **TT#1/SEGAL**'s text message to mean that CS-1 could pick up his winnings the next day (Monday). CS-1 wrote back to **TT#1/SEGAL** via text, "Cool. Might be Tuesday. Thanks." **TT#1/SEGAL** responded via text, "Ok."

24. During a consensually recorded interaction on Tuesday, February 3, 2015, CS-1 met with SEGAL at the LUCKY LADY to collect his $1,500 Super Bowl winnings, as well as a $1,650 deposit that CS-1 had made on that bet. CS-1 asked SEGAL if CS-1 could leave a deposit for future bets. SEGAL declined to hold on to the money as a deposit and stated that CS-1 could simply call or text him for future bets.

25. On March 19, 2015, at 8:38 p.m., CS-1 sent a text message to **TT#1/SEGAL** from telephone number 760-802-5804 saying, "Is the spread still State by 3.5?" **TT#1/SEGAL** responded by saying, "Yes." [CS-1 and SEGAL were discussing the betting odds on an upcoming college basketball game.]

   2.  Evidence of Sports Gambling Transactions between Sanders
       SEGAL and Betting Customers

26. The following are examples of intercepted communications to and from **TT#1/SEGAL** that further illustrate how **TT#1/SEGAL** is being used in furtherance of an illegal gambling business.

27. On March 16, 2015, at 6:15 p.m., **TT#1/SEGAL** received a phone call from telephone number 619-523-8475 (subscribed to Firmino Ferreira, according to phone

12

records).    Upon   hearing   the   caller's   greeting,   SEGAL   stated   "What's   up   Cully [phonetic]?"   The caller then asked SEGAL for the odds "on March Madness, Kentucky to win everything."   SEGAL agreed to find out and let him know.

28.    On   March   18,   2015,   at   8:32   p.m.,   telephone   number   619-300-1344 (subscribed to Sydney SEGAL, according to phone records) sent a text message to **TT#1/SEGAL**   saying,   "OK...Start   of   the   tourney   [the   NCAA   Men's   Basketball Tournament]...Don't   let   that   number   get   any   higher,   unless   he's   good   for   it." Approximately two minutes later at 8:34 p.m., **TT#1/SEGAL** responded, "He's good for 6 figures [at least $100,000]..."   [SEGAL is discussing betting limits for an illegal sports betting client.]

29.    On March 19, 2015, at 3:38 p.m., **TT#1/SEGAL** called telephone number 619-743-7077 (subscribed to and used by Stanley PENN) to convey that, "Brad's hot . . . He just hit a $31.80 horse."   PENN asked, "How much did he have on it?"   SEGAL said, "50. That's still 795."   PENN said, "Your weekly payment is going down."   SEGAL said, "Yeah, no shit.   That really bothers me too."[9]   [SEGAL and PENN were discussing the amount of money that SEGAL was collecting on horse racing bets from a particular bettor.]

30.    On April 8, 2015, at 1:07 p.m., **TT#1/SEGAL** received a text message from telephone number 604-966-7344 (believed to be used by Pablo Ballestero FRECH), which

---

[9] In my training and experience, this conversation tends to show PENN's knowledge of SEGAL's bookmaking activities.  Surveillance has established Stanley PENN's presence at the LUCKY LADY on more than one occasion during undercover operations in this investigation.  For example, on January 30, 2015, CS-1 met with SEGAL at the LUCKY LADY to place a bet on the Super Bowl.   Although SEGAL asked CS-1 to place his betting money in an envelope so that PENN could not see it, PENN walked over to CS-1 and SEGAL while CS-1 and SEGAL were meeting.   As PENN is the owner of the LUCKY LADY and apparently moves freely about the card room, PENN could have interrupted and overheard the conversation between CS-1 and SEGAL at any time. Accordingly, in my opinion, it does not appear that SEGAL's request was sincerely aimed at keeping PENN in the dark about the illegal gambling activities operating on the premises.

stated "Sea und 7." According to publicly available information on oddsshark.com on the afternoon of April 8, 2015, the over/under on the Seattle Mariners v. Los Angeles Angels April 8, 2015 baseball game was 7, meaning that the bettors could place wagers that the total number of runs scored during the game would be over or under 7. This is the same number quoted in the text message to **TT#1/SEGAL**. Accordingly, based on my training and experience, I believe this text message was intended to convey wagering information to **TT#1/SEGAL**.

           3.     Evidence of Sports Gambling transactions between Joseph SPATAFORE and Sanders SEGAL

    31.   The following are examples of intercepted communications to and from **TT#1/SEGAL** that further illustrates how **TT#1/SEGAL** and **TT#3/SPATAFORE** are being used in furtherance of an illegal gambling business.

    32.   On March 18, 2015, at 4:36 p.m., **TT#1/SEGAL** called **TT#3/SPATAFORE** and SEGAL said he needed to get a bet down for Kentucky to "win it all" [a reference to place a bet on Kentucky to win the 2015 NCAA Men's College Basketball Tournament]. SEGAL said that "Betmex" was "ridiculous at 175" and "way out of line" [meaning that SEGAL believed the betting odds provided by the sports betting website, Betmex.net, were unreasonable because SEGAL would have to risk $175 to win $100]. In response, SPATAFORE said he had it at "+139" [meaning that, if SEGAL placed the same bet with SPATAFORE, SEGAL would only to risk $139 to win $100]. SEGAL then asked, "Can I get 800 [$800.00] on it?" SPATAFORE said, "Yep," and confirmed that the bet was at "+139." [Although SPATAFORE is one of SEGAL's biggest betting clients, in this particular interchange, SPATAFORE acted as bookmaker to SEGAL.]

    33.   On March 31, 2015, at 10:23 a.m., **TT#3/SPATAFORE** called **TT#1/SEGAL**, and SPATAFORE said he had a question about "Goldaction" [a betting website] and asked if he should bet "futures" or not bet them. SPATAFORE asked, "Can I get more credit on there?" [SPATAFORE was asking whether he could get more credit on the Goldaction sports betting account]. SEGAL answered, "Ya probably" and

14

explained that, "I just paid him 5,000.00 [$5,000] to get you in" [i.e., SEGAL had just paid KARLSSON $5,000 in connection with SPATAFORE's illegal sports betting activity.]   SEGAL asked, "What kind of futures are you [SPATAFORE] betting . . . baseball?" SPATAFORE answered, "Ya. Baseball futures" [referring to season-long bets that relate to a particular baseball team's performance].

34.   On April 1, 2015, at 12:47 p.m., **TT#1/SEGAL** called **TT#3/SPATAFORE**, and SEGAL said, "At 7 O'clock you can bet 3,000 [$3,000.00], so I don't think 15 or 20 minutes is going to make a difference."   SEGAL said that he'd just got a call from "Pab" [Pablo Ballestero FRECH], and he [FRECH] said "if you look on the account, it is set up for 250 till 7 O'clock in the morning like most of their wiser players."   [SEGAL and SPATAFORE were discussing the time frame during which SPATAFORE could use a sports betting account to place a particular bet, and SEGAL was indicating that the timing restrictions were designed with the "wiser players" in mind.   In my training and experience, among other things, illegal bookmakers will sometimes impose time limits and other restrictions on certain illegal sports bets in order to protect themselves from excessive gambling losses.   In this particular instance, it appears that SEGAL was communicating about this sort of time limit to SPATAFORE, i.e., a time limit that would prevent SPATAFORE from making certain bets until 7 in the morning.   In my training and experience, the reference to "wiser players" is sports bookmaking vernacular for bettors who demonstrate a propensity to be able to win large bets on a regular basis, based on their analytical skills or abilities to accurately predict the outcome of sporting contests].

35.   On April 25, 2015, at 7:07 a.m., **TT#3/SPATAFORE** texted **TT#1/SEGAL**, and said, "Padres r h errors is a win."   At 7:08   a.m., **TT#1/SEGAL** texted **TT#3/SPATAFORE**, and said, "No its not...."   At 7:16 a.m., **TT#3/SPATAFORE** texted **TT#1/SEGAL**, and said, "Ah . . . 2 days in a row same play, ur right."   At 7:16 p.m., **TT#1/SEGAL** texted TT#3/SPATAFORE, and said, "Ok." [This text message exchange indicates that SPATAFORE had placed a bet with SEGAL on the San Diego

15

Padres baseball team (particularly their runs, hits, and errors) and that there was some initial disagreement (which they subsequently resolved) about whether SPATAFORE won that bet].

## C.   SELECTED EVIDENCE REGARDING THE LAUNDERING OF PROCEEDS FROM ILLEGAL SPORTS GAMBLING TRANSACTIONS

36.     This Part presents evidence of past and ongoing money laundering of the proceeds of illegal sports bookmaking.  The first section presents evidence about money laundering involving the proceeds from activities carried out in connection with the LUCKY LADY, and the second section describes money laundering activities carried out in connection with various sports gambling websites.  The evidence also shows that these activities are themselves connected.  The third section presents evidence about ongoing illegal bookmaking and money laundering activities that relate particularly to Target Subject Petter Magnus KARLSSON.

### 1.     Money Laundering Connected to the LUCKY LADY

37.     On December 18, 2013, when SDPD Detective Dan Vile and I interviewed CS-1, CS-1 recalled that, at the time CS-1 was previously employed at the LUCKY LADY, SEGAL asked CS-1 to set up a bank account in the United States so that PENN's illegal sports betting funds could be funneled through an account in Costa Rica. According to bank records, this account was opened in approximately December 2005. According to CS-1, this bank account remained active until sometime in 2007 or 2008.

38.     Furthermore, according to CS-1, the LUCKY LADY has had a longstanding practice of allowing illegal sports bettors to use its money cage, a practice which allowed for the commingling of illegal sports gambling proceeds with otherwise legitimate income generated at the LUCKY LADY.  However, after a money laundering investigation began posing questions in February 2015 about the money cage at the Palomar Club, another San Diego-based card room, it appears that the practice of accepting money for illegal sports wagers became more surreptitious at the LUCKY LADY.

LSTV-TIII-PLEAD-15MC0291-000166

39.   According to CS-1, on March 18, 2015, when CS-1 attempted to open a "player's bank" in the amount of $1,000 at the LUCKY LADY's cage, LUCKY LADY employee Willie Saco told CS-1 that they had stopped doing "players' banks" about three weeks ago.  When CS-1 asked Saco if that was because of what happened across the street, i.e., at the Palomar Club, Saco agreed that was probably the reason.  Saco further stated that people had been taking chips home from the cage so they did not have to report cash transactions over $10,000.  Unfortunately, this March 18, 2015 interaction between Saco and CS-1 was not recorded because of an equipment malfunction.

40.   Two days later, on March 20, 2015, during a consensually recorded call with CS-1, Stanley PENN confirmed that he was aware of the investigation at the Palomar Card Club.  When CS-1 informed PENN that Saco had told CS-1 that the LUCKY LADY was not doing a player's bank anymore, PENN responded, "Not really, no" and claimed that he was just "making it clean for the division, that the only thing we have on there is the corporation," meaning that the only entity now operating out of the cage was the corporation that contracted with the LUCKY LADY to act as "the house" in connection with some of the LUCKY LADY's card games.

41.   Notwithstanding PENN's claims, during another consensually recorded conversation on the same day, March 20, 2015, LUCKY LADY bookmaker Jeffrey BURKE told CS-1 that the "player's bank" would not close for BURKE because BURKE had had the account for so long and that BURKE believed that longstanding players could keep their accounts open.

42.   On March 20, 2015, at 4:38 p.m., telephone number 858-213-6866 (subscribed to John THOMAS, according to phone records) called **TT#1/SEGAL**.  The caller, who identified himself as "John," asked SEGAL if he "could get a couple of lines" from him.  SEGAL said, "all right, hold on" and then "ok, go ahead."  John said, "Wisconsin," to which SEGAL responded "twenty-two" [meaning that the spread for the upcoming Wisconsin college basketball game was 22 points].  John then asked about, "San Diego State," to which SEGAL responded "five" [meaning that the spread for the

17

1  upcoming San Diego State college basketball game was five points]. After discussing the
2  spreads on a few other college basketball games, John stated that he would bet on "San
3  Diego State to win 200 . . . minus five" [meaning that John was betting $200 that San
4  Diego State would beat their opponent by more than five points]. Toward the end of the
5  conversation, John THOMAS and SEGAL arranged to meet the following morning at 10
6  a.m. at "the gas station."

7       43.    In an effort to observe the anticipated March 21, 2015 meeting between John
8  THOMAS and SEGAL, agents set up surveillance at a Mobile gas station on 4282
9  Camino Del Rio North, a location that agents selected because of its proximity to
10 SEGAL's residence. Although agents were unable to observe a direct meeting between
11 John THOMAS and SEGAL, agents were able to observe SEGAL driving toward his
12 residence at 10:20 a.m. Moreover, a conversation intercepted two hours later supports
13 that SEGAL had, in fact, met with John THOMAS that morning for the purpose of
14 collecting money. At 12:11 p.m. on March 21, 2015, **TT#1/SEGAL** called 619-300-1344
15 (subscribed to Sydney SEGAL, according to phone records). According to his own
16 intercepted statements on March 20, 2015, Sydney SEGAL works the "cage" at the
17 LUCKY LADY. On that call, SEGAL directed Sydney SEGAL to "scratch John
18 Thomas" because "I picked it up this morning." SEGAL further indicated that he had
19 "added 2,000 [$2,000] to the blue bag." Sydney SEGAL confirmed his understanding of
20 the transaction, "So scratch and then add 2000 [$2,000]?"

21      44.    On March 24, 2015, at 1:31 p.m., Sanders SEGAL used **TT#1/SEGAL** to
22 call Sydney SEGAL at 619-300-1344. Sanders told Sydney that, "Stan's got 35 now,"
23 and asked, "Do you understand the 35?" Sydney responded, "Yeah, you added to it or
24 whatever." Sanders then reiterated, "Yeah, 35,000. Stan's got it."

25      45.    On March 25, 2015, at 12:23 p.m., **TT#1/SEGAL** called CS-1 to arrange for
26 CS-1 to pick up $500 that CS-1 had recently won on an illegal sports wager on the San
27 Diego State vs. St. John's college basketball game. At approximately 12:48 p.m., CS-1
28 arrived at the LUCKY LADY. During a consensually recorded meeting, CS-1 talked with

18

1   SEGAL and PENN for a short period of time about unrelated matters.  According to CS-1,

2   upon PENN's departure approximately twenty minutes into the conversation, SEGAL

3   handed CS-1 five $100 bills while CS-1 was seated at one of the LUCKY LADY's poker

4   tables.[10]

5                  **2.**     Money Laundering Connected to Websites

6      46.   Recent intercepted communications to and from **TT#1/SEGAL** have

7   provided further information about SEGAL's role as a bookmaker for other illegal sports

---

[10] In connection with this meeting to exchange illegal sports betting proceeds at the LUCKY LADY, SEGAL said to CS-1, "we have to be careful . . . I don't want Stan knowing shit."  Given SEGAL and PENN's prior forthright discussions about sports gambling, such as that summarized above in paragraph 29, I do not believe that SEGAL is truly concerned with keeping PENN in the dark about his illegal sports gambling activities.  Rather, based on my training and experience, I believe that SEGAL's March 25, 2015 statements to CS-1 relate to PENN's concerns about the money laundering investigation at the Palomar Card Club, described earlier in Paragraphs 37-41, and PENN's desire to keep a low profile until that investigation is resolved.

There is additional evidence that, in my opinion, based on my training and experience, indicates PENN's desire to insulate him from any consequences associated with the illegal bookmaking activity being conducted out of his establishment the LUCKY LADY.  In the fall of 2014, CS-1 reported that PENN and SEGAL's friend and fellow bettor, David Mikovich, passed away.  On March 9, 2015, according to CS-1, PENN claimed not to have made any bets in the last six to eight months because of Mikovich's death.  Likewise, during a consensually recorded meeting on February 18, 2015, while CS-1 was paying SEGAL to cover his lost wager, SEGAL told CS-1 that PENN believed that Mikovich died because of the stress associated with betting and, therefore, PENN stopped making bets once Mikovich died.  SEGAL claimed that, because of PENN's concerns about Mikovich's fall 2014 death, SEGAL no longer did "any collecting up there," i.e., at the LUCKY LADY.  Notwithstanding SEGAL's claims about discontinuing "any collecting" at the LUCKY LADY, both James TEAR and Sanders SEGAL engaged either in collection activities or sports wagering at the LUCKY LADY in January, February, and March of 2015.  Also, on June 3, 2015, UC-2 picked up winnings from Minh NGUYEN at the LUCKY LADY on an illegal sports bet that UC-2 placed with NGUYEN on the Mayweather v. Pacquio championship boxing fight.  Furthermore, on June 11, 2015, UC-2 picked up from TEAR at the LUCKY LADY the balance of an illegal sports betting account that UC-2 previously had established with TEAR to place wagers over the internet.

19

1   bettors, as well as information about some of SEGAL's connections to other Target
2   Subjects, money laundering, and illegal sports gambling websites (such as BetMex.net,
3   goldactionsports.com, and play888.com).      A sample of pertinent intercepted
4   communications is outlined below.

5       47.    On March 20, 2015, at 12:54 p.m., **TT#1/SEGAL** called 604-966-7344
6   (believed to be used by Pablo Ballastero FRECH) to discuss an account, SYW101, with
7   password SY9098, that was accessible through one of two sports gambling websites:
8   play888.com and goldactionsports.com.    During this discussion, FRECH stated, "that
9   account only has 25K [$25,000] in credit."   SEGAL said, "That's okay.  I'll split it
10  between mine and his."  FRECH then asked how "Joe" [believed to be Target Subject Joe
11  SPATAFORE] was doing.  SEGAL indicated, "He [Joe] owes me 20,000," and "I owe
12  Magnus [believed to be Target Subject Petter Magnus KARLSSON] 43,000 on the
13  account."  [SEGAL and FRECH were discussing amounts owed and credit limits related
14  to an online sports betting account.]

15      48.    On April 2, 2015, at 9:03 a.m., **TT#1/SEGAL** called telephone number 949-
16  280-1944 (subscribed to David LEPPO, according to phone records).   According to a
17  publicly accessible video interview of David LEPPO on YouTube, LEPPO is the CEO of
18  two sports betting websites:  FootballBet.com and BetMex.net.   During this telephone
19  call, SEGAL inquired about why the "BetMex" account could not be accessed from
20  SEGAL's laptop computer.   LEPPO acknowledged the problem and, in attempting to
21  solve the access problem, indicated that he was "talking to London now" and that he
22  would "call the office down in Costa Rica."  After discussing this access problem, LEPPO
23  and SEGAL arranged to meet later that day in Del Mar.  Agents conducted surveillance of
24  this meeting and observed SEGAL approach a vehicle registered to David LEPPO.  Inside
25  LEPPO's vehicle, agents observed a male driver who resembled the DMV photo
26  associated with LEPPO.   Agents observed SEGAL reach into LEPPO's vehicle briefly
27  and then depart shortly thereafter.

28

LSTV-TIII-PLEAD-15MC0291-000170

49.  At 1:12 p.m. on April 2, 2015, less than two hours after the meeting with LEPPO, **TT#1/SEGAL** called Sydney SEGAL (telephone number 619-300-1344) and instructed him to "take 10 off the blue bag," laughingly explaining that he lost it "gambling."  Sanders told Sydney he lost it through "blackjack," to which Sydney responded "bull shit."  Sanders then laughed and admitted that he "had to pay a guy 10,000 [$10,000]," but the "big guys bet 30 [$30,000] this week so far, so hopefully that will be pumped up by Monday."

50.  On April 8, 2015, at 9:32 a.m., **TT#1/SEGAL** called telephone number 66-899-646-6333 (believed to be used by Target Subject Petter Magnus KARLSSON). During the conversation SEGAL stated, "The guy bet 5,000 when he was only supposed to bet 3,000 in each spot. I'm trying to get hold of Pab to try and change it to 3, unless you care and leave it at 5." KARLSSON stated in response, "He bet 5,000 at Gold Action Sports?" SEGAL answered, "I called him up and reamed his ass out." KARLSSON then stated, "That's fine, we all make mistakes" and agreed to leave the bet at 5,000. [KARLSSON and SEGAL were discussing illegal sports wagers made through an online sports betting account at goldactionsports.com.]

3.  KARLSSON's Connection to Illegal Bookmaking and Money Laundering Activities

51.  Target Subject Petter Magnus KARLSSON, who appears to reside outside the United States and, according to CS-1, operated a casino in Thailand, recently made a visit to San Diego and the LUCKY LADY.  The events surrounding KARLSSON's visit further demonstrate ongoing illegal bookmaking and money laundering activities.

a.  Discussions in Advance of KARLSSON's Visit

52.  On April 16, 2015, at 1:49 p.m., **TT#1/SEGAL** called telephone number (604) 966-7344 [believed to be used by Target Subject Pablo Ballestero FRECH, an individual who appears to be a co-partner in the illegal bookmaking business in which SEGAL operates], to discuss their illicit sports betting operation.  SEGAL said, "He's supposed to be coming, but I don't know when." [This portion of the conversation refers

LSTV-TIII-PLEAD-15MC0291-000171

to an anticipated visit by Target Subject Petter Magnus KARLSSON, who appears to reside outside the United States and, according to CS-1, operates a casino in Thailand]. SEGAL said, "I was followed again last week. I think it was because I met with that fucking David [David LEPPO], . . . for Magnus." [These statements appear to refer to law enforcement surveillance that SEGAL believed he observed shortly after meeting with LEPPO in early April, as set forth in paragraphs 99(a)(x) – (xi)]. SEGAL said, referring to LEPPO, "That guy's wide open." FRECH responded in agreement, "He [Leppo] is always doing shit on TV." FRECH then asked, "How's Joe doing?" [It is believed that "Joe" is Target Subject Joe SPATAFORE, a large bettor, and that SEGAL and FRECH maintain a financial interest in Joe's wins and losses]. In response, SEGAL said, "Magnus is supposed to come here and talk about it. Cause I don't know what my makeup was or anything." SEGAL asked, "How much do we owe Magnus?" FRECH said, "Like 18" [$18,000]. [A "makeup," or a "makeup figure," is sports betting vernacular for the difference between what a bookmaker or betting client owes for his/her betting account, based on the wins and losses on bets placed with the bookmaker or the betting organization].

53.    A few hours later, at 3:35 p.m. on April 16, 2015, **TT#1/SEGAL** again called FRECH at telephone number (604) 966-7344, to discuss whether they were in or out of "makeups." FRECH said, "I spoke to him [Petter Magnus KARLSSON]. I went over the figures with him. He said up until mid-November we were on 144,000 makeups, 144K [$144,000]." FRECH said, however, that they now might be out of "makeup" by "2,000" [$2,000]. FRECH said that FRECH asked him [KARLSSON] whether they were considered "out of makeup." FRECH said that he [KARLSSON] told FRECH, "Yeah, but I want to talk to Sandy first when I see him . . . . I'm a reasonable guy. I want you guys to make money this and that, but I just, I just want to talk to him [SEGAL] about bringing in more action." FRECH told SEGAL that he [KARLSSON] was "coming on Thursday, next Thursday he's flying in there. He's only going to be with you for one day and then he's flying down to Costa Rica." [The FBI confirmed that Petter Magnus

1  KARLSSON was booked on a Japan Airlines flight from Tokyo to Los Angeles on
2  Thursday, April 23, 2015].

3        54.    On April 23, 2015, at 7:49 a.m., Stanley PENN called **TT#1/SEGAL**.
4  SEGAL answered, "Good morning." PENN asked, "Hey, do you want me to drop the
5  20,000 [$20,000] off in your mailbox now." SEGAL said, "No. No. No. He [Petter
6  Magnus KARLSSON] is not coming 'till tonight. He won't be down here 'till tonight."
7  [The call appears to refer to KARLSSON's trip from Tokyo to San Diego, on April 23,
8  2015, to meet with SEGAL. The call further suggests that PENN is offering to deliver
9  $20,000 to SEGAL to be paid to KARLSSON. Based, among other things, on my training
10 and experience and the content of prior conversations regarding money owed to
11 KARLSSON in connection with the illegal gambling business that were intercepted to and
12 from **TT#1/SEGAL,** some of which are described in paragraphs 52 and 53 above, I
13 believe probable cause supports that this $20,000 payment represents proceeds of the
14 Target Subjects' illegal gambling operation].

15            b.    Karlsson Visits the Lucky Lady and Places Illegal Sports
16                  Gambling Proceeds in Player's Bank

17       55.    On April 23, 2015, the FBI confirmed through the TECS data base at the Los
18 Angeles International Airport (LAX), that Petter Magnus KARLSSON flew from Tokyo
19 to Los Angeles and arrived at approximately noon. KARLSSON proceeded through
20 United States Custom's inspection, where a routine photograph of him was taken. The
21 photograph showed that KARLSSON was wearing a white button-down dress shirt and
22 carrying a light-grayish-colored backpack. According to the TECS data base,
23 KARLSSON was traveling on a one-way ticket, with no information readily available
24 regarding a return or connecting flight.

25       56.    On April 23, 2015, the FBI instructed CS-1 to play poker inside the LUCKY
26 LADY, starting at approximately 2:00 p.m. The FBI also established fixed surveillance
27 outside the LUCKY LADY, to attempt to observe Petter Magnus KARLSSON meeting
28 with Sanders SEGAL. FBI surveillance was not able to observe KARLSSON's arrival,

LSTV-TIII-PLEAD-15MC0291-000173

1  but CS-1 observed KARLSSON inside the LUCKY LADY meeting with SEGAL at a
2  poker table. According to CS-1, KARLSSON was wearing a white shirt, and had in his
3  possession a light-grayish-colored backpack. CS-1, who works as a limo driver, gave
4  KARLSSON his business card.

5    57.    On April 23, 2015, at 6:53 p.m., **TT#1/SEGAL** called Sydney SEGAL at
6  telephone number (619) 300-1344. [Prior to the telephone call, Sydney SEGAL sent
7  multiple text messages to **TT#1/SEGAL** that "Magnus is getting crazy here," and "Your
8  boy just got kicked out"]. Sanders SEGAL asked (in the telephone call), "What do you
9  mean?" Sydney SEGAL said, "He [Petter Magnus KARLSSON] was getting out of hand
10 on the table. And he started yelling." Sanders SEGAL said, "He's been drinking too
11 much."

12   58.    On April 23, 2015, at 7:48 p.m., Petter Magnus KARLSSON called
13 **TT#1/SEGAL** from the international telephone number 66899646333. KARLSSON said,
14 "Hi Sandy." SEGAL asked, "What's up?" KARLSSON said, "They threw me out. I was
15 playing poker. And this guy said he's going to fuck me up, and I pushed him and now I'm
16 out." KARLSSON said, "If I can't go in. Then we're done. And I want all my money,
17 and I just want to go. I'm being treated like a fucking asshole." SEGAL asked, "So
18 you're saying our business is over with and you want your money?" [Based on my
19 training and experience and the context of their various communications, it appears that
20 SEGAL is asking KARLSSON about the illegal bookmaking business that they run and
21 proceeds from that illegal bookmaking business.] SEGAL subsequently said, "You're
22 drunk."

23   59.    On April 23, 2015, at 7:59 p.m., **TT#1/SEGAL** called Sydney SEGAL, at
24 telephone number (619) 287-3091 [according to CS-1, this telephone number is the direct
25 line to the money cage at the LUCKY LADY; according to telephone records, this
26 telephone number is subscribed to Stanley PENN at the LUCKY LADY's address].
27 Sanders SEGAL said, "He's already called me and he's drunk. But now he's embarrassed
28 and he doesn't want to do any more business with me. So I have to give him his 60,000

24

LSTV-TIII-PLEAD-15MC0291-000174

1   [$60,000] or whatever tomorrow."   [It is believed that this is a reference to $60,000 that

2   Sanders SEGAL owes to Petter Magnus KARLSSON in connection with their illegal

3   sports gambling operation]. Sydney SEGAL asked, "Do you need what I got?"  Sanders

4   SEGAL said, "No. No. That's my money."

5       60.   On April 23, 2015, at 8:54 p.m., **TT#1/SEGAL** called his son, Sydney

6   SEGAL, at telephone number (619) 300-1344.  Sanders SEGAL asked, "What do you

7   mean he just banked 16,000 [$16,000]?"  Sydney SEGAL said, "He [Petter Magnus

8   KARLSSON] deposited the money, cause he's taking off. I don't know where he's going.

9   But he didn't want 16,000 in his backpack."  Sanders SEGAL asked, "Well, he just put it

10  in the cage?" Sydney SEGAL said, "In the player's bank, in the cage." Sanders SEGAL

11  said, "I don't know if that was legal," and then asked, "So he lost 4,000 [$4,000] playing

12  poker?" Sydney SEGAL said, "He probably had another 1,000 [$1,000] in his pocket. So

13  he probably lost 3,000 [$3,000]."  [It is believed that this call refers to the $20,000 that

14  PENN and Sanders SEGAL had discussed earlier that day.  It appears that KARLSSON

15  deposited $16,000 at the "cage" in the LUCKY LADY, lost approximately $3,000 at

16  poker, and kept $1,000. By depositing the $16,000 at the "cage" in the LUCKY LADY,

17  KARLSSON could more easily claim at a later date that the $16,000 was the legitimate

18  proceeds of legal gambling, when as described above, it appears that the money actually

19  came from SEGAL.]  Later in the evening, after KARLSSON was kicked out of the

20  LUCKY LADY, KARLSSON called CS-1 for a ride. Between the hours of 9:00 p.m. that

21  night to 6:30 a.m. the next morning, CS-1 drove KARLSSON to the Cheetah's

22  Gentlemen's Club, in San Diego; the Village Club Casino, in Chula Vista, CA; and the

23  Howard Johnson Hotel, in San Diego. According to CS-1, KARLSSON indicated to CS-1

24  that KARLSSON had left $16,000 at the "cage" in the LUCKY LADY.    CS-1

25  contemporaneously reported this information to the FBI, and CS-1's conversations with

26  KARLSSON throughout the evening were recorded by the FBI on a body recording

27  device. CS-1 also maintained contact with both Sanders SEGAL and Sydney SEGAL,

28  who instructed CS-1 to try to get the money back to KARLSSON, because they didn't

LSTV-TIII-PLEAD-15MC0291-000175

1  want the money left at the "cage."  According to CS-1 and intercepted communications,

2  KARLSSON failed to return to the LUCKY LADY that night, and the money was left at

3  the "cage" to be picked up at a later time by KARLSSON.

4  **D.    BRIBERY AND PUBLIC CORRUPTION INVESTIGATION**

5      61.    For the reasons set forth below, I believe that **TT#1/SEGAL** and

6  **TT#3/SPATAFORE** are being used in connection with an effort to improperly influence

7  the San Diego City Council and other public officials to change existing San Diego laws

8  that regulate the LUCKY LADY.

9      62.    The discussion of the evidence related to these improper efforts will proceed

10  as follows.  The first part will discuss evidence obtained directly from intercepted calls to

11  and from **TT#1/SEGAL** between SEGAL and SPATAFORE.  The second part will

12  discuss interviews conducted in connection with your Affiant's investigation into this

13  matter.

               1.    Intercepted    Conversations    Related    to    SEGAL    and
14                      SPATAFORE's Efforts to Change San Diego Laws

15      63.    Between approximately April 30, 2015 and May 13, 2015, **TT#1/SEGAL**

16  was intercepted communicating on multiple occasions with **TT#3/SPATAFORE** about a

17  potential sale of the LUCKY LADY.  During these communications, the users of

18  **TT#1/SEGAL** and **TT#3/SPATAFORE** discussed changes to existing San Diego city

19  laws that must occur before such a sale could take place.  Specifically, SPATAFORE and

20  SEGAL discussed changing a legal provision—colloquially known as the "Grandfather

21  Clause" or the "Sunset Clause"—that prohibits San Diego's two existing card rooms (the

22  LUCKY LADY and the Palomar Club) from being sold or transferred to new owners.

23      64.    On April 30, 2015, at 10:43 a.m., **TT#3/SPATAFORE** and **TT#1/SEGAL**

24  were intercepted discussing the Grandfather Clause as it relates to both of San Diego's

25  existing card rooms.  In particular, SEGAL stated that the elderly owners of the Palomar

26  Card Club wanted to sell the Palomar and that their daughter had "hired a firm [to lift] the

27  Grandfather Clause."  In response, SPATAFORE asked, "Is that possible?"  SEGAL said,

28

LSTV-TIII-PLEAD-15MC0291-000176

1   "Not now, but if they drop the Grandfather Clause, yes." SPATAFORE again asked, "Is
2   that a possibility?" SEGAL answered, "Yes. It was almost done before, but then they
3   changed the police chief. They changed the Mayor. And the City Manager is against it,
4   but the Council has already voted for it." SPATAFORE asked, "The Council of San
5   Diego?" SEGAL said, "Yeah."

6       65.   Transitioning to the LUCKY LADY and the Grandfather Clause's impact
7   upon it, SEGAL said during this April 30, 2015 conversation that, "I think Stan [referring
8   to PENN, the owner of the LUCKY LADY] would sell [the LUCKY LADY] for the right
9   price." SPATAFORE asked, "Like what?" SEGAL repeated, "The right price."
10  SPATAFORE said, "Find out what it is … I'll get you a buyer if it's reasonable, like not a
11  ridiculous, number." SEGAL then suggested a sale price of, "20 million [$20 million].
12  With the license and everything." SPATAFORE responded, "I'm dead serious. Find out
13  a price and I'll talk to you tomorrow. I have somebody." SEGAL cautioned, "I mean the
14  Grandfather Clause hasn't even been passed yet so … we're talking Disneyland right
15  now." SPATAFORE said, "Yeah, that would be a contingency." [SPATAFORE appears
16  to be stating that he has found someone who would be interested in purchasing the
17  LUCKY LADY and that the sale of the LUCKY LADY would be contingent upon a
18  change to the Grandfather Clause]. Less than a half hour later, at 11:07 a.m.,
19  **TT#3/SPATAFORE** called **TT#1/SEGAL**, and SPATAFORE said, "I might want to sit
20  down with him [PENN]. I am serious. I'm not just bullshitting around. I think I have a
21  way I can do this. Legitimately and all." SEGAL said, "I understand."

22      66.   Over the course of the next two weeks, SPATAFORE and SEGAL's
23  conversations about the potential sale of the LUCKY LADY, and the accompanying
24  change to the Grandfather Clause, became increasingly concerned with potential political
25  roadblocks that might interfere with their attempts to change the Grandfather Clause.
26  During an intercepted call on May 9, 2015, at 7:12 p.m., for example, SEGAL said, "It's
27  the City Attorney that's the hold up. I mean we have a girl that deals for us. Her nephew
28  is a City Councilman. And that's what we heard, through him. This fucking City

27

Attorney." SPATAFORE told SEGAL that, "I had a conversation . . . they say without some kind of help there's no way it's going to get through, but that's according to these guys. I really don't have any idea myself personally."

67. During this May 9, 2015 intercepted call, SPATAFORE and SEGAL also continued to discuss PENN's willingness to sell the LUCKY LADY, as well as the price that should apply to such a sale. SPATAFORE said, "Let's talk hypotheticals. If I have a way to get the Grandfather Clause through . . ." At which point, SEGAL interrupted and said, "I think he'll sell" [indicating that PENN likely would sell if SPATAFORE was able to get the Grandfather Clause changed]. SPATAFORE continued, "If I say this is the price. And this is assuming that we can get that passed [i.e., the amendment to the Grandfather Clause passed]. . . He would probably go for that, right?" SEGAL said, "I absolutely think so." SPATAFORE and SEGAL then transitioned to negotiating an appropriate sale price. In this context, SPATAFORE said, "I don't know what kind of number [what sale price would be appropriate]. That would have to be negotiated." In response, SEGAL stated that, "The number has to be serious. He's not going for chicken fees. This is not a fire sale" [meaning that PENN would not be willing to sell the LUCKY LADY for a low price]. SPATAFORE retorted that, "He [PENN] is getting older and if he doesn't get the thing passed [i.e., if the Grandfather Clause doesn't change], he's getting nothing." SEGAL responded by noting how profitable the LUCKY LADY currently is and claimed that, "He's getting 70 or 80 grand at this time from the corporation that's in there now, a month" [meaning that PENN currently receives $70,000 to $80,000 in profits per month from the "corporation," i.e., the entity that serves as "the house" for certain card games conducted at the LUCKY LADY]. According to my investigation, PENN also receives profits from a variety of other sources at the LUCKY LADY, including cash profits from those card games that do not require the services of the "corporation," as well as payments from the business entities that lease the bar and restaurant.

LSTV-TIII-PLEAD-15MC0291-000178

68.   Within days of learning from SEGAL that the LUCKY LADY's profits were at least $70,000 to $80,000 per month, SPATAFORE appears to have revisited the kind of effort he would be willing to undertake in order to change the Grandfather Clause and thereby enable a sale of the LUCKY LADY.   During this conversation, intercepted at 8:38 p.m. on May 13, 2015, SEGAL asked, "Do you really think that you can get the Grandfather Clause . . . ?" SPATAFORE responded, "there's another way to do it . . . I'm not going to get into it . . . I think I can get it done." A few minutes later, SPATAFORE further stated that, "I got a way to do it . . . we can get this done in a couple of months if we can agree on a price, a reasonable price . . . it costs money to get this done." [As summarized below in paragraph 82, based on the context and cryptic nature of these comments, as well as subsequent investigation and my training and experience, among other things, I believe that SPATAFORE's comments support that he is attempting to improperly influence San Diego public officials to amend the Grandfather Clause.]

69.   During   this   May   13,   2015   conversation,   SEGAL   responded   to SPATAFORE's suggestion that "there's another way to do it," by describing his own prior success at persuading City Council to change an earlier San Diego regulation. According to SEGAL, this prior regulation had prohibited the LUCKY LADY from hosting Texas Hold 'Em card games, and "he [PENN] was almost out of business in '99 . . . because . . . they wouldn't let him go to Hold'em." SEGAL bragged that "I was in prison and got them votes" to change the law [based on a criminal history query, it appears that SEGAL was in custody in 1999 on illegal bookmaking charges, which in my training and experience tends to suggest that any of his lobbying efforts to change gambling regulations at that time were unlikely to have been transparent or legitimate]. SEGAL further stated that, back in 1999, "She [BEVERLEY] was only a fucking dealer, but she got the gay gal on the Council . . . and that's how she got in" [implying that Jan BEVERLEY also had helped get the votes at San Diego City Council to change the law and that this was the reason she currently holds a high-ranking position at the LUCKY LADY].

29

LSTV-TIII-PLEAD-15MC0291-000179

2.   Interviews That Confirm the Existence of Contemporaneous
Efforts to Change San Diego Laws

70.   SDPD Detective Vile, who has been working on this investigation since its inception, informed his chain-of-command and briefed SDPD Chief Shelley Zimmerman about the content of the above intercepted communications. Detective Vile and I also interviewed Chief Zimmerman on May 28, 2015, to determine whether persons in San Diego were trying to influence Chief Zimmerman and/or San Diego City Council to change the San Diego Municipal Code and amend the Grandfather Clause. Chief Zimmerman advised that she had, in fact, received a letter dated January 22, 2015 from Arkan SOMO and Alan Ziegaus, asking to meet with her about amendments to the San Diego Municipal Code regarding card room regulations, including the Grandfather Clause. The letter was signed by SOMO on behalf of "Somo & Associates," and Ziegaus on behalf of "Southwest Strategies LLC."[11] Chief Zimmerman advised that, on February 26, 2015, she met with Arkan SOMO and Alan Ziegaus at her office at SDPD Headquarters. During this February 26, 2015 meeting, SOMO and Ziegaus stated that they wanted her to agree to recommend to City Council that the Municipal Code be changed to allow San Diego's existing card rooms to be transferred or sold to new owners. Although SOMO and Ziegaus advised Chief Zimmerman that the owner of one of the two card rooms was very ill and that the card room would close if he died, Chief Zimmerman's impression was that SOMO and Ziegaus were lobbying on behalf of both San Diego cardrooms (the LUCKY LADY and the Palomar Card Club). SOMO and Ziegaus told Chief Zimmerman that amending the Grandfather Clause basically had been a done deal, but "we" had a mayor change and a police chief change, implying that the

---

[11] According to an internet search conducted on June 26, 2015, Southwest Strategies LLC and Somo & Associates advertise themselves as public relations firms. Furthermore, according to a publicly accessible internet news link from 2014, the Palomar Card Club is a lobbying client of Southwest Strategies LLC and is the only officially listed lobbying client of Somo & Associates. I have not located any similar links that mention the LUCKY LADY in connection with Southwest Strategies LLC or Somo & Associates.

LSTV-TIII-PLEAD-15MC0291-000180

1   Grandfather Clause already would have been changed if those individuals were still in
2   office and that Zimmerman was a road block in this regard.  Chief Zimmerman further
3   indicated that SOMO might have identified the former Police Chiefs (Jerry Sanders and
4   William Landsdowne) by name.  In response, Chief Zimmerman advised SOMO and
5   Ziegaus that, based on her experience in law enforcement as a "vice" and "undercover"
6   officer, she was very comfortable with the way the Municipal Code was currently written,
7   including the Grandfather Clause.

8       71.    During the May 28, 2015 interview that Detective Vile and I conducted with
9   Chief Zimmerman, Chief Zimmerman also advised that multiple members of City Council
10  had approached her to get her opinion on whether Council should change the Municipal
11  Code to permit a change in ownership of the card rooms.[12]   According to Chief
12  Zimmerman, she advised these City Council members that the Municipal Code should not
13  be amended to permit a change in ownership.

14      72.    During the May 28, 2015 interview that Detective Vile and I conducted with
15  Chief Zimmerman, Chief Zimmerman further advised that, on the morning of May 12,
16  2015, when she was visiting San Diego City Council on another matter, she saw Ziegaus
17  and a second person, who appeared to be Arkan SOMO, leaving the City Council's
18  Offices.  Notably, this was just one day before Joe SPATAFORE's May 13, 2015
19  telephone call to Sanders SEGAL during which SPATAFORE claimed that, "there's
20  another way to do it . . . I'm not going to get into it . . . I think I can get it done" and that,
21  "I got a way to do it . . . we can get this done in a couple of months if we can agree on a
22  price, a reasonable price . . . it costs money to get this done."

23

---

24  [12] In addition, on June 25, 2015, Chief Zimmerman advised SDPD Detective Vile that a
25  Council member had contacted her earlier that day regarding the Grandfather Clause.  The
    Council member advised Chief Zimmerman that Arkan Somo wanted to meet with the
26  Council member to discuss the Grandfather Clause and that Arkan Somo had suggested
27  that Chief Zimmerman's position on the Grandfather Clause might have changed.  In
    response, Chief Zimmerman confirmed that her position remained the same and that she
28  maintained that no amendment of the Grandfather Clause was necessary.

LSTV-TIII-PLEAD-15MC0291-000181

73.     On June 8, 2015, your Affiant and Detective Dan Vile conducted an interview of a citizen source in San Diego, California, to gather further information about Arkan SOMO.  The citizen source, who asked that his/her identity be protected, was initially interviewed one week earlier in connection with an unrelated case.  The citizen source was selected for an interview on that unrelated matter in order to obtain, among other things, general information about San Diego's "Chaldean" ethnic community, a community in which the citizen source is believed to be held in high regard.  The source works as a member of San Diego's business community and is in a position to know other San Diego business persons, as well as elected officials in San Diego politics.  The source has no known criminal history and stated that he/she was motivated to accept law enforcement's request for an interview because of his desire to help San Diego's "Chaldean" ethnic community.[13]  During the initial interview, the citizen source stated that Arkan SOMO is a secret owner of the Palomar Card Club.  Based on the citizen source's comments about SOMO during this initial interview on an unrelated matter, your Affiant and Detective Vile interviewed the citizen source in connection with this investigation to gather further information about Arkan SOMO.

74.     During the June 8, 2015 interview conducted by Detective Vile and your Affiant, the source advised that he/she was well-acquainted with Arkan SOMO, a fellow member of San Diego's "Chaldean" community.  The source stated that he/she had been informed that SOMO essentially would extort money from store owners who had gotten themselves in trouble with the authorities.  The troubled store owners informed the source that SOMO would claim that he could "fix" their problems with the authorities in exchange for money.  According to what the source learned from the troubled store owners, SOMO would "resolve" the store owners' problems by using the money from the

---

[13] According to criminal history queries conducted in June 2015, the citizen source does not appear to have any criminal arrests or convictions.  Furthermore, I have no reason at this time to doubt the citizen source's statement about what motivated him to speak with law enforcement about Arkan SOMO.

32

store owners to bribe officials. The source provided multiple examples of incidents involving SOMO's bribery efforts about which the source was aware. For example, according to information that the source learned from one particular store owner in El Cajon, SOMO collected $25,000.00 from the store owner to bribe a California Alcohol Beverage Control (ABC) liquor license official. The store owner's understanding was that this $25,000 bribe would keep ABC from completely revoking the store's liquor license. The store owner's hopes were realized when, soon after giving SOMO the money, the store owner learned that ABC would allow the store to continue operating, provided that the store owner transfer technical ownership of the store to one of the store owner's relatives. Another example of SOMO's bribery efforts and underhanded business dealings, according to the source, involved a different El Cajon store owner. According to information that the source learned from this second El Cajon store owner, SOMO collected $200,000.00 from the store owner in exchange for SOMO's "help" in a dispute about the store owner's liquor license. In this particular instance, instead of allowing the store owner to sell the business to a relative, SOMO required that the store owner transfer ownership of the business to SOMO. The store owner was permitted to continue running the business, but SOMO thereafter charged the store owner $10,000.00 a month for the use of SOMO's name. A third example of SOMO's bribery efforts and underhanded business dealings, according to the source, involved yet another El Cajon store owner who was attempting to obtain a liquor license. The source learned from this third El Cajon store owner that the El Cajon City Council was against issuing another license in the area of El Cajon where the store owner wanted to operate the store. The store owner told the source that SOMO offered to fix the problem for $100,000.00 and that SOMO promised he would use this money to influence a specific Council person on the El Cajon City Council. The store owner further told the source that, notwithstanding the store owner's payment of $100,000.00 to SOMO, the owner of the store failed to get Council's approval to get the liquor license and the store owner still had to transfer ownership of the store to SOMO.

LSTV-TIII-PLEAD-15MC0291-000183

75.     During the June 8, 2015 interview that Detective Vile and I conducted, Detective Vile also questioned the source about the Palomar Card Club.  The source advised that, since the time that both SOMO and the source were working together for the San Diego Merchant's Association, it appeared that SOMO and the current manager of the Palomar Card Club, Naseem Salem (Nick Salem), were very close friends.  The source said that it was widely discussed in the Chaldean community that SOMO had offered to "fix" the current problems related to the "Sunset Clause," aka the "Grandfather Clause," in the San Diego Municipal Code in exchange for a thirty three percent (33%) ownership interest in the Palomar Card Club.  On a related note, the source also was informed by a Palomar Card Club employee that SOMO shows up at the Palomar Card Club every Wednesday, walks in with a briefcase, stays only for a few minutes, and then leaves with the briefcase.  Based on the foregoing, the source expressed his/her belief that SOMO was coming to the business to get cash and concealing it in the briefcase when he left the business.

76.     The source further indicated that it was widely discussed in the Chaldean community that SOMO had lobbied in the past, and presently was continuing to lobby, several politicians about the "Sunset Clause," aka the "Grandfather Clause."  The source stated that, according to discussions within the Chaldean community, SOMO and Salem once offered then-Mayoral candidate Carl DeMaio $150,000.00 to have the clause reversed once elected Mayor.[14]  According to what the source had heard, the plan did not work because DeMaio would not go along with it.  Furthermore, the source heard that SOMO and Salem were so nervous upon learning about DeMaio's unwillingness to participate that they both got attorneys to prepare for what they thought would be their imminent arrest and prosecution.

77.     The source also stated that, according to discussions within the Chaldean community, SOMO and Salem also had tried to lobby Council Woman Marty Emerald

---

[14] According to publicly accessible information, Carl DeMaio ran for Mayor in 2012.

34

about the Sunset Clause, aka the Grandfather Clause.   In addition, according to discussions within the Chaldean community, the source stated that SOMO and Salem had lobbied Emerald in 2009 or 2010 to change the number of gaming tables that were allowed in San Diego cardrooms.   According to the source, the San Diego City Council then voted on the issue, and the cardrooms were allowed to put in additional tables in the businesses

E.   **CONCLUSIONS REGARDING ILLEGAL SPORTS GAMBLING, MONEY LAUNDERING, AND BRIBERY AND PUBLIC CORRUPTION**

78.   As the consensually recorded and intercepted communications described in paragraphs 22 through 35 demonstrate, SEGAL has used **TT#1/SEGAL** to engage in bookmaking and has engaged in bookmaking on the premises of the LUCKY LADY.   As set forth above, I believe that the money from this bookmaking activity is being laundered in violation of 18 U.S.C. §§ 1956 and 1957.   Indeed, during the consensually recorded communications described in paragraphs 22 through 24 and 45, SEGAL used **TT#1/SEGAL** to arrange for CS-1 to pick up CS-1's gambling winnings at the LUCKY LADY, a cash based exchange that in my training and experience further supports that the money used for legitimate gambling and for illegal bookmaking is being commingled at the LUCKY LADY.   I therefore believe that SEGAL is using **TT#1/SEGAL** to further the money laundering and illegal bookmaking business operating out of the LUCKY LADY.

79.   In connection with the bookmaking activity described above, I believe that Sanders SEGAL, Stanley PENN, Sydney SEGAL, and others launder money in violation of 18 U.S.C. §§ 1956 and 1957.   As described above, the LUCKY LADY had a longstanding practice of allowing sports bettors to leave their payments for losing wagers at the LUCKY LADY's money cage, which allowed these proceeds to be commingled with the LUCKY LADY's otherwise legitimate income.   Furthermore, as summarized above, Sydney SEGAL—who works the money cage at the LUCKY LADY—has been intercepted on multiple occasions discussing illegal sports wagers and agreeing to subtract

35

or add multiple thousands of dollars to and from a "blue bag" whenever Sanders SEGAL so requests. In addition, as already described, SEGAL solicited another individual to open a joint bank account for the purpose of funneling Stanley PENN's sports betting proceeds through Costa Rica. This account was opened in approximately December 2005 and remained active until approximately 2007 or 2008. Moreover, PENN's more recent bank records from 2014, as described in the Financial Analysis section below, show hundreds of thousands of dollars per month in cash deposits and withdrawals and hundreds of thousands of dollars in monetary transfers between twelve accounts, activity that is consistent with attempts to conceal the origin of illegally generated cash proceeds. Furthermore, as set forth above, I believe that SEGAL has used **TT#1/SEGAL** to further this money laundering activity. In summary, based on agent surveillance, information from confidential sources, consensually recorded conversations, and bank records, as well as my training and experience, I believe that one or more of the Target Subjects are conducting a money laundering operation out of the LUCKY LADY.

80.    I also believe that SEGAL is using **TT#1/SEGAL** in furtherance of the illegal gambling business operating out of the LUCKY LADY, in violation of 18 U.S.C. § 1955. Conducting, financing, managing, supervising, directing, or owning a gambling business is a federal crime under 18 U.S.C. § 1955, provided that the gambling business: (1) is illegal under state law; (2) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (3) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. Because it involves bookmaking, this gambling business is illegal in California. CAL. PENAL CODE § 337a. Based on the wagers discussed above, including SEGAL's one-day collection of $2,000 from John THOMAS, I have probable cause to believe that the illegal gambling business has had gross revenue of $2,000 in any single day. Furthermore, based on the wagers discussed above, including CS-1's wagers between January 2015 and the present, I have probable cause to believe that the illegal gambling business has been in substantially continuous operation for a

period in excess of thirty days.  I also have probable cause to believe that this illegal gambling business involves at least five people who are conducting, financing, managing, supervising, directing, or owning all or part of the business.  The LUCKY LADY has dozens of employees, according to SDPD Vice Unit Records.  According to CS-1, several bookmakers, including TEAR, SEGAL, Jeffrey BURKE, Danny HUYNH, and Nam Than NGUYEN, have operated at the LUCKY LADY over the course of the last year, and the illegal bookmaking business is common knowledge among the LUCKY LADY's employees.  Furthermore, based on the intercepted communications described in paragraphs 22, 28, 29, 30, 32, and 50, I believe that at least five other individuals— including Sanders SEGAL, Stan PENN, Sydney SEGAL, Petter Magnus KARLSSON, Pablo Ballestero FRECH, Joe SPATAFORE and others whose names are currently unknown—are also involved in conducting this illegal gambling business.

81.    As set forth in paragraphs 32 through 35, SPATAFORE has used **TT#3/SPATAFORE** to place illegal sports bets with SEGAL and exchange website and password information to facilitate the placing of illegal sports bets.  Furthermore, as set forth in paragraph 32, SPATAFORE has used **TT#3/SPATAFORE** on at least one occasion to act as a bookmaker and take an illegal sports bet from SEGAL.  SPATAFORE has additionally used **TT#3/SPATAFORE** as set forth in paragraphs 32 through 35, to communicate with SEGAL to discuss credit limits associated with online sports betting accounts, as well as to discuss other members of the gambling organization that are providing financial and/or computer services to aid in the illegal gambling enterprise.

82.    For the reasons set forth in detail above and summarized below, I also believe that **TT#1/SEGAL** and **TT#3/SPATAFORE** are being used in connection with efforts to improperly influence San Diego public officials to amend a San Diego law—colloquially known as the "Grandfather Clause."  My belief that SEGAL and SPATAFORE are engaged in illegal attempts to amend the Grandfather Clause is based, among other things, on the content of intercepted conversations between **TT#1/SEGAL** and **TT#3/SPATAFORE**.  On multiple occasions, SEGAL and SPATAFORE discuss

LSTV-TIII-PLEAD-15MC0291-000187

potential political roadblocks that might interfere with efforts to amend the Grandfather Clause. The cryptic and secretive nature of SPATAFORE's statements about how he plans to get the Grandfather Clause changed, as well as SPATAFORE's reference to the monetary cost of changing that clause, likewise support that they are engaged in improper efforts to influence public officials to change the law. As SPATAFORE indicated to SEGAL during an intercepted phone call: "there's another way to do it [amend the Grandfather Clause] . . . I'm not going to get into it . . . I think I can get it done" and "I got a way to do it . . . we can get this done in a couple of months if we can agree on a price, a reasonable price . . . it costs money to get this done." SEGAL's response to these statements further reinforces my belief that SEGAL and SPATAFORE are engaging in attempts to improperly influence San Diego public officials to change the Grandfather Clause. Indeed, SEGAL responded to SPATAFORE by bragging about how SEGAL previously had succeeded in changing a different gambling regulation even though SEGAL had been in custody at the time: "I was in prison and got them votes" to change the law. Consistent with the content of SEGAL and SPATAFORE's conversations, the San Diego Chief of Police has confirmed that individuals, who appear to represent both the Palomar Club and the LUCKY LADY, recently approached her in an effort to change the Grandfather Clause. As set forth above, one of these individuals, Arkan SOMO, is widely believed to have been involved in numerous attempts to bribe and improperly influence public officials, including improper attempts to amend the Grandfather Clause. In addition to the information set forth above, common sense considerations also support my belief that SEGAL and SPATAFORE are engaging in illegal efforts to influence public officials to change the Grandfather Clause. Without a change to the Grandfather Clause, the LUCKY LADY could not continue operating if its elderly owner, Stan PENN, were to die. That the LUCKY LADY is already the site of significant and profitable illegal activity—including money laundering and illegal gambling activities—provides a

LSTV-TIII-PLEAD-15MC0291-000188

strong motivation for the illegal actors associated with these activities (including SEGAL and SPATAFORE) to amend the Grandfather Clause by any means necessary.[15]   In summary, I believe that **TT#1/SEGAL** and **TT#3/SPATAFORE** are being used in furtherance of a scheme to improperly influence public officials to change existing San Diego law.  This belief is based, among other things, upon my training and experience, the content of intercepted wire communications, interviews with the Chief of Police and a citizen source familiar with issues at hand, and the circumstances surrounding the current operation of the LUCKY LADY.

## VI

## TOLL DATA ANALYSIS

83.   The following telephone analyses further corroborate my belief that the Target Telephones are being used to facilitate the Criminal Activity:[16]

### Wire Communications to and from TT#1/SEGAL

84.   Between August 19, 2014, and July 9, 2015, **TT#1/SEGAL** (used by Sanders SEGAL) has made and/or received 714 calls with 619-300-1344, a telephone number subscribed to and used by Sydney SEGAL.

85.   As described above in paragraphs 43, 44, and 49, Sydney SEGAL works the money cage at the LUCKY LADY and was intercepted on multiple occasions discussing illegal sports wagers and agreeing to subtract or add multiple thousands of dollars to and from a "blue bag" whenever Sanders SEGAL so requests.   Sydney SEGAL also

---

[15]   Among other reasons, because the illegal gambling and money laundering business appears to be so closely tied to the LUCKY LADY, I believe that activity and conversations about the potential sale of the LUCKY LADY are pertinent not only to the public corruption and bribery aspects of this investigation, but also are directly pertinent to the illegal gambling and money laundering aspects of this investigation.

[16]   The last date listed in the toll range is the date of the most recent contact with the Target Telephone.

LSTV-TIII-PLEAD-15MC0291-000189

participated in the handling of a $16,000.00 deposited in a "player's bank" at the cage by PETTER Magnus KARLSSON, as described in paragraph 60. The money appears to have been paid to KARLSSON by Sanders SEGAL to pay down Sanders SEGAL's "make-up figure" with KARLSSON for their sports bookmaking operation.

Wire Communications to and from TT#3/SPATAFORE

86. Between December 26, 2014, and June 29, 2015, **TT#3/SPATAFORE** made and/or received 251 calls with 424-321-5023, a telephone subscribed to and used by Imad SAMOUNA, aka Eddie SAMOUNA.

87. My review of phone records has shown that the contacts between **TT#3/SPATAFORE** and SAMOUNA sometimes are closely intertwined with the contacts that occur between **TT#3/SPATAFORE** and **TT#1/SEGAL**. For example, the fifteen-minute call between **TT#1/SEGAL** and **TT#3/SPATAFORE** on May 13, 2015 at 8:37 p.m.— during which SPATAFORE tells SEGAL that, "there's another way to do it [amend the Grandfather Clause] . . . I'm not going to get into it . . . I think I can get it done" and "I got a way to do it . . . it costs money to get this done"—was followed less than two minutes later at 8:54 p.m. by an eleven-minute call from **TT#3/SPATAFORE** to SAMOUNA. Similarly, on May 20, 2015, at 3:17 p.m., **TT#3/SPATAFORE** called **TT#1/SEGAL** for one minute, and immediately thereafter called SAMOUNA at 3:18 p.m. and talked for two minutes. One minute after the conversation between **TT#3/SPATAFORE** and **TT#1/SEGAL** had concluded, **TT#1/SEGAL** and **TT#3/SPATAFORE** had another phone conversation that began at 3:21 pm and that lasted 16 minutes. Likewise, on May 28, 2015, at 11:02 a.m., **TT#3/SPATAFORE** called SAMOUNA and talked for one minute, and thereafter called **TT#1/SEGAL** at 11:04 a.m. and engaged in a 12-minute conversation.

88. In addition, FBI Special Agent Delicia Speller informed me that Imad SAMOUNA is a subject in the FBI's investigation of the Palomar Card Club, an investigation that involves an illegal gambling business and money laundering operation

40

1   closely connected to San Diego's other card room.  On June 17, 2015, I met with Agent

2   Delicia Speller about SAMOUNA.   Agent Speller is the FBI's Case Agent in the

3   "Palomar" case.  Agent Speller advised that SAMOUNA was a bookmaker and a criminal

4   associate of Nick Salem, the manager of the Palomar Card Club.  On July 3, 2013, CS-4 (a

5   source in the "Palomar" case),[17] reported that SAMOUNA gambled at the Palomar Card

6   Club and also collected illegal bets on football, baseball, and basketball.  According to

7   CS-4, on Tuesdays between 11:00 a.m. to 12:00 p.m., SAMOUNA had people collect

8   money for SAMOUNA at the Palomar Card Room and at the Village Club (the Village

9   Club is a cardroom in Chula Vista, CA).

10       89.    Agent Speller also advised me about a witness in the Palomar Card Club case

11   that was supplying information about Imad SAMOUNA.   On February 6, 2015, the

12   witness was interviewed and reported to FBI agents that he/she met SAMOUNA at the

13   Village Club through Robert "Bob" Redmer and the late John Spatafore (a possible

14   familial relation to Joe SPATAFORE).  The witness stated it was common knowledge at

15   the Village Club that SAMOUNA was a "bookie."   The witness also stated that John

16   Spatafore (deceased) went broke due to the fact that SAMOUNA and Spatafore were

17   betting heavily and ended up losing a lot of money.  Agent Speller advised that the

18   witness was an employee at the Village Club for over 15 years, and volunteered his/her

19   information to FBI agents.  Agent Speller believed the witness' information to be reliable

20   based on the above and because the information was corroborated by other sources and

21   searches in the "Palomar" case.  I checked FBI records about the deceased John Spatafore

22   and determined that he was a bookmaker in the 1970s and 1980s, and the subject of FBI

23

---

24   [17] Agent Speller advised that CS-4 started providing information in the "Palomar"
25   investigation in 2013.  A criminal history query for CS-4 revealed an arrest in 2012, for
     non-sufficient funds.  CS-4 has been an FBI source for 10 years.  SA Speller believed that
26   CS-4 was reliable because his/her information was corroborated by other sources, physical
27   surveillance, consensual recordings and business record checks.  CS-4 was compensated
     approximately $8,500.00 for assisting law enforcement in cases prior to the "Palomar"
28   case.

41

1  organized crime investigations. I spoke with a retired FBI agent who was familiar with
2  John Spatafore, who advised me that he was known as "off track Johnny," because he
3  placed bets on Del Mar horse races from a pay phone outside of the racetrack to East coast
4  organized crime betting establishments. The bets were placed just prior to or just after the
5  end of a horse race, which allowed Spatafore to know the results of the race moments
6  before East coast bookmakers could officially record the horse that won.

7       90.   On June 21, 2015, I checked FBI records for other investigations that targeted
8  Imad SAMOUNA, apart from the Palomar Card Club investigation with which I was
9  familiar. I did this to investigate his likely involvement in sports bookmaking. I learned
10 that SAMOUNA was the target of an FBI organized crime investigation in Detroit
11 Michigan, in 2005 and 2006, where SAMOUNA was shown to be directly involved in
12 betting on, and "fixing," college basketball games and horse races. In the Detroit case,
13 FBI agents used court authorized wire interceptions to attempt to infiltrate a "middle
14 eastern" criminal enterprise group involved in fixing horse races and collegiate sporting
15 events throughout the United States. SAMOUNA was intercepted on multiple occasions
16 discussing the placing of bets on sporting events and the "fixing" of college basketball
17 games and horse races.   At some point in that investigation, however, SAMOUNA
18 stopped speaking with the primary target of the case, and was not prosecuted. According
19 to criminal history queries, SAMOUNA's criminal history reflects that he was arrested for
20 gambling in Michigan on at least three separate occasions in 1975, 1991, and 1995.
21 SAMOUNA's arrests in 1975 and 1991 resulted in misdemeanor gambling convictions,
22 while the charges related to SAMOUNA's arrest in 1995 were dismissed. Toll record
23 analysis at the time of the Detroit case in 2005 and 2006, established that SAMOUNA
24 was in telephone contact with Harvey Frank Souza—who was then and continues to be
25 the owner of the Village Club Cardroom in Chula Vista, CA, and who, according to FBI
26 and SDPD investigators working in San Diego during the 1970s and 1980s, was an
27 organized crime associate of the deceased John Spatafore.   Specifically, between
28 September of 2005 and June of 2006, at least 36 telephone calls occurred between a phone

LSTV-TIII-PLEAD-15MC0291-000192

1  known to be used by SAMOUNA and the number to the Village Club Cardroom, Souza's

2  business.

### Electronic Communications to and from TT#1/SEGAL

91.  Between September 6, 2014, and July 7, 2015, **TT#1/SEGAL** has made and/or received 1,760 text messages with 619-300-1344, a telephone number subscribed to and used by Sydney SEGAL.

92.  Between February 16, 2015, and May 11, 2015, **TT#1/SEGAL** has made and/or received 20 text messages with 858-603-0410, a telephone number subscribed to and used by Minh NGUYEN.  As set forth in paragraphs 20 and 95(b) and footnote 10, NGUYEN is a known bookmaker operating out of the LUCKY LADY with whom UC-2 placed an illegal sports bet on the May 2, 2015 Mayweather vs. Pacquiao boxing match.

### V

### **NECESSITY**

93.  While we have made significant progress in this investigation, we have not yet achieved all of the investigative goals set forth in paragraph 9 of Section III. Continued interception of **TT#1/SEGAL** and initial interception of **TT#3/SPATAFORE** is necessary to accomplish these goals because, as set forth below, normal investigative procedures have been tried and failed, reasonably appear unlikely to succeed if tried, or are too dangerous.

### A.    **Confidential Sources**

94.  This investigation has used or attempted to use at least four confidential sources (CSs), including the following examples.

a.    **CS-1:**  As discussed above, CS-1 is a former employee and current customer of the LUCKY LADY who has reported that an illegal gambling business is operating out of the LUCKY LADY.  Although CS-1 worked at the LUCKY LADY approximately six years ago, CS-1's current connection to the LUCKY LADY is limited to that of a customer and occasional limo driver for others traveling to and from the

LSTV-TIII-PLEAD-15MC0291-000193

LUCKY LADY.  CS-1 has provided some helpful background information about the Target Subjects and the illegal gambling business operating at the LUCKY LADY. Furthermore, as detailed above, over the last year CS-1 has made numerous bets with the Target Subjects, has conducted consensually recorded conversations with SEGAL and other Target Subjects, and has paid and collected gambling winnings and losses.  In addition, CS-1 has provided some limited information about individuals who he has driven to and from the LUCKY LADY.[18]

As a customer making wagers and an occasional limo driver for those traveling to and from the LUCKY LADY, however, CS-1 cannot achieve all of the goals of this investigation.  In my experience, bookies are not likely to expose customers to the inner workings of their illegal gambling operations, how their illegal gambling proceeds are laundered, or the scope of their illegal bookmaking business.  Furthermore, although CS-1 knows some of the Target Subjects both socially and as a customer, CS-1 is not close enough to SEGAL and the other Target Subjects to obtain information on the full extent of the Criminal Activity, including the full volume and geographic scope of the illegal bookmaking business, the manner and means of related money laundering activities, including the total quantities of illegal gambling proceeds collected and laundered, or how

---

[18]  On September 26, 2014, for example, CS-1 reported that on the prior day, he drove an individual named "Magnus" from the LUCKY LADY to another card room in Chula Vista. Magnus, later identified as target subject Petter Magnus KARLSSON, claimed to be in the sports wagering business and told CS-1 that he was in town to meet SEGAL, an individual who Magnus believed to be the owner of the LUCKY LADY. This interaction was not recorded, and CS-1 was never informed about the outcome of Magnus's meeting with SEGAL.  Similarly, on April 23, 2015, CS-1 again served as limo driver for KARLSSON while KARLSSON was in town for a brief visit to the LUCKY LADY, as well as other gambling and adult establishments in the San Diego area. During this April 23, 2015 visit, KARLSSON informed CS-1 that KARLSSON had left a large sum of money at the money cage in the LUCKY LADY.  According to CS-1, KARLSSON showed CS-1 a $16,000 receipt for the money that KARLSSON deposited at the cage and told CS-1 that he had $100,000 there, but did not explain to CS-1 the origin or specific purpose of this money.

LSTV-TIII-PLEAD-15MC0291-000194

1 the illegal gambling proceeds are currently laundered. Indeed, CS-1 had a falling out with

2 SEGAL several years ago and has only recently begun the slow and painstaking process

3 of repairing the rift in their relationship.[19]  According to CS-1, SEGAL continues to be

4 wary when meeting with CS-1.  For example, during a consensually recorded meeting

5 with CS-1 on February 18, 2015, SEGAL explicitly expressed concern about the presence

6 of a marked police car in a nearby location.  At the next consensually recorded meeting

7 between SEGAL and CS-1 on February 24, 2015, SEGAL changed the meeting location

8 shortly beforehand, a tactic often used as a counter-surveillance measure by individuals

9 engaged in illegal activity and a tactic that succeeded on this occasion in preventing agents

10 from photographing the meeting.  Furthermore, during an April 15, 2015 intercepted call

11 between CS-1 and **TT#1/SEGAL**, CS-1 asked if he could place an illegal sports bet on

12 the Padres professional baseball team, but SEGAL refused.  SEGAL, who had spotted an

13 FBI vehicle surveilling him one week earlier, explained that he was "laying low . . . in

14 other words, I try to do favors for friends like yourself and then I end up getting followed .

15 . . that's it for me."  In light of SEGAL's continued caution when dealing with CS-1 and

16 the fact that CS-1 no longer works at the LUCKY LADY, I do not believe that CS-1 can

17 achieve all the goals of this investigation.

18

19

20 [19] During a consensually recorded conversation on February 18, 2015, SEGAL mentioned a potential sexual harassment lawsuit that LUCKY LADY employees had considered

21 filing against LUCKY LADY bar manager Danny HUYNH.   SEGAL also briefly

22 discussed an ongoing investigation into potential money laundering at a different casino: the Palomar Card Room.  Furthermore, as discussed above, SEGAL told CS-1 that PENN

23 had quit making bets in the fall of 2014 and, as a result, SEGAL claimed to have

24 discontinued making any "collections," i.e., collecting sports wagers, at the LUCKY LADY.  This latter claim is directly undercut by evidence gathered in this investigation.

25 Indeed, as set forth in this affidavit, illegal sports betting and the exchange of money

26 related to illegal sports betting at the LUCKY LADY has occurred on several occasions during January and February of 2015.  In sum, it appears that SEGAL did not provide CS-

27 1 much accurate information, if any, about the inner workings of the illegal gambling

28 business currently operating at or in close connection with the LUCKY LADY.

b.    **CS-2**[20]:  CS-2 is a low-level gambler who previously installed slot machines in houses near El Cajon Boulevard in San Diego.  CS-2, who has a social relationship with Danny HUYNH and Nam THANH, has provided some helpful background information on the Target Subjects, including the phone number for bookmaker Danny HUYNH.  However, because CS-2 is known to be a low-level player with limited funds, CS-2 does not have access to the inner workings of the LUCKY LADY and is not in a position to frequent the LUCKY LADY to gather current information on SEGAL and TEAR and the other Target Subjects.  Furthermore, to my knowledge, CS-2 is not an associate of SEGAL or PENN.  Accordingly, CS-2 cannot accomplish the goals of this investigation.  Nevertheless, over the course of the next 30 days of interceptions, we will continue to evaluate ways to utilize CS-2 in connection with our interceptions.

c.    **CS-3:**  CS-3 is an informant who previously provided information in 2011 and 2012 in connection with a separate FBI investigation.[21]  On May 20, 2015,

---

[20] CS-2 has served on and off as an FBI confidential source since August 2003.  CS-2 provided information related to this investigation in September and October 2014.  According to a criminal history query, CS-2 has accrued two convictions:  (1) a 1991 felony conviction for robbery, in violation of California Penal Code § 211; and (2) a 2010 misdemeanor conviction for battery on a spouse or ex-spouse in violation of California Penal Code §243(e)(1).  I believe that CS-2 has provided credible and reliable information because, in part, it has been corroborated by physical surveillance, consensual recordings, and phone records.  Although CS-2 previously has been compensated for services in connection with other investigations and has been reimbursed approximately $300 for expenses incurred on behalf of this investigation, CS-2 has not been compensated for services in this investigation in any other manner.

[21] In connection with this separate FBI investigation into a different San Diego bookmaker, CS-3 was opened as a source by the FBI on September 20, 2011, and closed on April 17, 2012.  CS-3 was operated by your Affiant and SDPD Detective Dan Vile and was paid approximately $4,100 in FBI case funds, which was used to pay outstanding debts that CS-3 had incurred with the bookmaker who was the target of that investigation.  CS-3 was closed based on CS-3's inability to further penetrate the bookmaker's criminal enterprise.  CS-3 was observed to participate in both gambling and the use of alcohol, but at no time appeared to provide your Affiant or Detective Vile with false or misleading

46

SDPD Detective Dan Vile met with CS-3 and showed him the California DMV photo of Target Subject Joseph SPATAFORE. CS-3 identified the individual in the photo as "Joe" and provided some helpful background information about the individual. In particular, CS-3 advised that SPATAFORE frequents on a daily basis the Del Mar Horse Racing Off Track Betting Facilities in Del Mar, California. According to CS-3, SPATAFORE carries multiple telephones and associates with Ted Aroney, who was an organized crime figure investigated by the SDPD in the 1970s and 1980s and who also was a close associate of organized crime figure William John Spatafore (now deceased). Although CS-3 may be in a position to provide some information concerning observations of SPATAFORE at the Del Mar Race Track, CS-3 is not in a position to penetrate the illicit relationship between "Joe" and Sanders SEGAL or with other subjects at the LUCKY LADY. CS-3 is not acquainted with Sanders SEGAL and is not familiar with the LUCKY LADY. Your Affiant will nevertheless maintain contact with Detective Vile and, whenever possible, use intelligence information provided by CS-3 to the SDPD as it becomes available to further this case.

        d.    **CS-4:**  On June 17, 2015, I met with Special Agent Delicia Speller of the FBI about SAMOUNA. Agent Speller advised me that, on July 3, 2013, CS-4 (a source in the "Palomar" case),[22] reported that SAMOUNA gambled at the Palomar Card

---

information. According to a criminal history query, CS-3 has sustained multiple prior convictions, including: (1) two 1984 felony convictions for 2nd Degree Vehicle Theft in Florida; (2) a 1984 felony conviction for Grand Larceny in Florida; (3) a 1991 conviction of an unknown nature in Massachusetts; (4) a 2000 misdemeanor conviction for grand theft, in violation of California Penal Code § 487(a); (5) a 2002 felony conviction for grand theft, in violation of California Penal Code § 487(a); and (6) a 2005 felony conviction for attempted extortion, in violation of California Penal Code § 524. I believe that CS-3 has provided credible and reliable background information in connection with the instant investigation because that background information has been corroborated, in part, with information known to agents and SDPD detectives who investigated Ted Aroney and William John Spatafore during the 1970s and 1980s.

[22] Agent Speller advised that CS-4 started providing information in the "Palomar" investigation in 2013. A criminal history query for CS-4 revealed an arrest in 2012, for non-sufficient funds. CS-4 has been an FBI source for 10 years. Agent Speller believed

Club and also collected bets on football, baseball, and basketball. According to CS-4, on Tuesdays between 11:00 a.m. to 12:00 p.m., SAMOUNA had people collect money for SAMOUNA at the Palomar Card Room and at the Village Club (the Village Club is a cardroom in Chula Vista, CA). CS-4 personally knows SAMOUNA and has had interactions with SAMOUNA on an infrequent basis. CS-4 has provided some helpful background information on SAMOUNA and SAMOUNA's bookmaking operations, but CS-4 cannot achieve all of the goals of this investigation, because CS-4 is not close enough to SAMOUNA to obtain information on the extent of SAMOUNA's criminal activities, including the volume and geographic scope of SAMOUNA's illegal bookmaking business, the manner and means of SAMOUNA's money laundering activities and bulk cash smuggling, including the quantities of illegal gambling proceeds collected and laundered, or how the illegal gambling proceeds are laundered. In addition, in my experience, bookies are not likely to expose customers to the inner workings of their illegal gambling operations, how their illegal gambling proceeds are laundered, or the scope of their illegal bookmaking business. Additionally, although CS-4 knew John SPATAFORE from the Village Club many years ago, I am unaware of any relationship between CS-4 and Joe SPATAFORE. At this time, it appears that CS-4 is only in a position to provide limited information about SAMOUNA, such as telephone numbers and potential money runners for SAMOUNA. Accordingly, CS-4 cannot accomplish all the goals of this investigation.

## B.    Undercover Agents

95.    The investigation has used at least four undercover agents (UCs), including the following examples:

---

that CS-4 was reliable because his/her information was corroborated by other sources, physical surveillance, consensual recordings and business record checks. CS-4 was compensated approximately $8,500.00 for assisting law enforcement in cases prior to the "Palomar" case.

48

a.   **UC-1:**   In March 2014, UC-1 was introduced to James TEAR, a LUCKY LADY employee and bookmaker, and placed a number of sports bets with TEAR in person at the LUCKY LADY.   UC-1 was unsuccessful, however, in establishing an online betting account with TEAR and the other Target Subjects.   On March 20, 2014, TEAR rejected UC-1's request to set up an online account.   Approximately one week later, on March 27, 2014, TEAR began asking CS-1 for details about UC-1 and his background.   Shortly thereafter, we discontinued using UC-1 as the primary undercover agent in this investigation because, among other reasons, we were concerned that his continued presence might compromise the investigation.

b.   **UC-2:**   In July 2014, UC-2 was successfully introduced to James TEAR.   Through TEAR, UC-2 obtained two online sports betting accounts via stakestake.com, one for UC-2 and one for UC-2's nephew.[23]   During their meetings, UC-2 conducted consensually recorded conversations with TEAR, and UC-2 has paid and collected gambling winnings and losses.   Since April 14, 2015, UC-2 has continued to engage in illegal sports betting activity with the Target Subjects and has conducted a variety of consensually recorded communications.   In May 2015, for example, UC-2 successfully established another online sports betting account, this time with Target Subject Minh NGUYEN.   However, UC-2 has been unable to engage TEAR, SEGAL, or any other Target Subject in more in-depth conversation.   Due to UC-2's limited access to large sums of currency, UC-2 cannot gamble at the LUCKY LADY with enough frequency to develop a close relationship with the Target Subjects to become a trusted associate.   UC-2's relationship is limited to being a gambling customer of TEAR and the

---

[23] Based on a review of the website via UC-2's profile and the profile of UC-2's nephew, the www.stakestake.com website provides odds and betting lines for the matches/contests/games that customers place bets on, administers the logistics of the gambler's account, and assists in managing a bookmaker's portfolio of accounts. According to a publicly accessible website (www.whois.safenames.net) that records registrant information for internet domain names, www.stakestake.com appears to be an offshore gambling website registered in the United Kingdom.

LSTV-TIII-PLEAD-15MC0291-000199

other Target Subjects. Further, besides TEAR generally referring to getting approval from his "guy" and informing UC-2 that NGUYEN might be able to handle bigger action, neither TEAR nor any other Target Subject have described to UC-2 the nature of their relationship with the other Target Subjects. Accordingly, they are unlikely to reveal to UC-2 the full volume and geographic scope of the illegal bookmaking business, the manner and means of any money laundering activities, including the quantities of illegal gambling proceeds collected and laundered, or how the illegal gambling proceeds are laundered.

   c. **UC-3:** On July 16, 2014, CS-1 introduced UC-3 to Stanley PENN and other Target Subjects as a well-funded individual interested in investing a large amount of cash in CS-1's limousine business. Although UC-3 was introduced to initiate financial conversations with PENN in the hope that PENN might invite UC-3 to discuss investment opportunities related to the LUCKY LADY, that hope did not materialize and UC-3 therefore was unable to gain access to the operational side of the illegal gambling business operating at the LUCKY LADY.

   d. **UC-4:** UC-4 has accompanied UC-2 to the LUCKY LADY and posed as his "date" to help UC-2 fit in at the LUCKY LADY. UC-4 has not been in a position to engage in criminal discussions or activity with the Target Subjects. At this point in the investigation, UC-4 is limited to being a friend of UC-2 or a possible gambling customer. Moreover, all limitations with respect to UC-2 also hold true for UC-4.

   e. In any event, there are inherent limitations to the ability of UCs and CSs to fully reveal the methods and membership of a criminal enterprise such as this, since sophisticated criminal organizations and sophisticated criminals typically take great pains to compartmentalize their operations and conceal their activities to avoid or hamper law enforcement infiltration. I believe this is why the Target Subjects have not revealed more of their operation to UC-2 and why SEGAL, after believing that he had been followed by law enforcement on April 8, 2015, discontinued taking bets from CS-1 shortly thereafter. I believe it would be very difficult to achieve all of the goals of this

50

1  investigation through the use of CSs or UCs, unless the CS or UC were already a high-
2  status member of the organization.  Unless an unusual opportunity presents itself, it is not
3  worth the risk to the investigation to approach a current Target Subject about cooperating.

4              **C.    Physical Surveillance**

5      96.    From April 2014 until the present, agents have conducted dozens of hours of
6  physical surveillance in this investigation.   The following are examples of physical
7  surveillance or attempted surveillance.

8          a.    **Physical Surveillance of Sanders SEGAL:**   During many hours of
9  surveillance between April 2014 and the present, FBI agents observed SEGAL travel back
10 and forth between his residence and the LUCKY LADY on multiple occasions, sometimes
11 traveling with a black bag that appeared to contain papers, including the following
12 examples:

13          i.    On April 10, 2014, for example, agents observed Sanders
14 SEGAL drive from the LUCKY LADY to his residence, a condominium at 4203
15 Collwood Lane in San Diego, owned by Stanley PENN.

16          ii.   At approximately 12:16 p.m. on April 17, 2014, agents observed
17 SEGAL arrive by car at the LUCKY LADY.   Approximately three hours later, at 3:28
18 p.m., SEGAL left the LUCKY LADY and appeared to stand on the street talking on his
19 cell phone. SEGAL then drove from the LUCKY LADY to his residence. It is unknown
20 what activities SEGAL engaged in while at the LUCKY LADY on this particular day, or
21 what the substance of his cell phone conversation entailed.

22          iii.   On May 6, 2014, agents observed SEGAL driving to the
23 LUCKY LADY.  Upon arriving at the LUCKY LADY, SEGAL walked up the stairs of
24 the rear entrance carrying a black bag which appeared to contain papers.  Later that same
25 day, agents observed SEGAL leave the LUCKY LADY carrying the same bag and drive
26 to his residence at 4203 Collwood Lane. It is unknown what activities SEGAL engaged in
27 while at the LUCKY LADY on this particular day, or whether the papers he was carrying
28 that day related to illegal gambling operations.

51

iv.　　On May 13, 2014, agents observed SEGAL drive from his residence to the LUCKY LADY at approximately 11:53 a.m.　Upon arriving at the LUCKY LADY, SEGAL walked toward the rear entrance carrying a black satchel. Approximately three hours later at 3:12 p.m., SEGAL left the LUCKY LADY and drove to a parking lot on 30th Street. SEGAL exited his vehicle and entered a building through a back door.　At approximately 3:49 p.m., SEGAL left the building in his car and, at approximately 4:06 p.m., arrived back at the LUCKY LADY.　While still in his vehicle, SEGAL appeared to have a brief conversation with a LUCKY LADY security guard through the open driver's side window.　Agents observed SEGAL drive back and forth between his residence and the LUCKY LADY several times throughout the remainder of the day. The purpose of SEGAL's activities on this day are unknown.

v.　　On March 2, 2015, agents observed SEGAL in a vehicle arriving at the LUCKY LADY at about 1:45 p.m.　SEGAL drove away from the LUCKY LADY at approximately 3:45 p.m. and traveled directly to his residence.　SEGAL remained at his residence until at least 6:30 p.m., at which point surveillance terminated.

vi.　　Since interception of SEGAL's communications began on March 16, 2015, agents have had some limited success surveilling SEGAL as he conducts Criminal Activity. For example, during an intercepted conversation on March 20, 2015, John THOMAS and SEGAL arranged to meet the following morning at 10 a.m. at "the gas station." In an effort to observe the anticipated March 21, 2015 meeting between John THOMAS and SEGAL, agents set up surveillance at a Mobile gas station on 4282 Camino Del Rio North, San Diego, a location that agents selected because of its proximity to SEGAL's residence.　Although it appears that the 10 a.m. meeting between John THOMAS and SEGAL did not occur at this particular location, agents did observe SEGAL driving toward his residence at 10:20 a.m.　A conversation intercepted two hours later supports that SEGAL had, in fact, met with John THOMAS that morning for the purpose of collecting money.　At 12:11 p.m. on March 21, 2015, **TT#1/SEGAL** called 619-300-1344 (subscribed to Sydney SEGAL, according to phone records) and directed

Sydney SEGAL to "scratch John Thomas" because "I picked it up this morning." SEGAL further indicated that he had "added 2,000 [$2,000] to the blue bag." Sydney SEGAL confirmed his understanding of the transaction, "So scratch and then add 2000 [$2,000]?"

           vii.      Furthermore, agents successfully surveilled SEGAL on March 23, 2015, as a result of specific information obtained through intercepted conversations. On March 23, 2015, at 10:28 a.m., telephone number 858-922-8828 (subscribed to Brad CHAPIN, according to Experian) called **TT#1/SEGAL**. SEGAL and the caller, who had engaged in multiple sports wagering conversations during the preceding week, discussed exchanging cash in a parking lot within the hour. In particular, the caller asked, "Could I just come there and meet you in front, bring you this cash?" On March 23, 2015, at 10:48 a.m., **TT#1/SEGAL** called telephone number 858-922-8828 (subscribed to Brad CHAPIN, according to Experian) to confirm that they would be meeting at the Costco on "Market Street right off the 15." On March 23, 2015, at 11:08 a.m., the user of telephone number 858-922-8828 (subscribed to Brad CHAPIN, according to Experian) called **TT#1/SEGAL** and stated that he was just getting off on Market Street and that, "I'll be there in about two minutes." SEGAL said, "I'm right in front of the store waiting on you . . . . I'm right in front, sitting down." CHAPIN said, "Ok, I'll be there in two minutes." Around this time, agents observed SEGAL meet with a man outside the Market Street Costco and exchange cash, as documented by photographs that agents took of the meeting.

           viii.     On March 25, 2015, after CS-1 went into the LUCKY LADY and collected $500 in winnings from SEGAL, agents conducted surveillance of SEGAL leaving the LUCKY LADY, going briefly to a donut shop, and leaving the donut shop empty handed.

           ix.      At 10:08 a.m. on March 30, 2015, **TT#1/SEGAL** received a call from telephone number 619-863-3064 (subscribed to Robert Biddle, according to public source telephone records). The caller asked, "Are you going to do the credit card or cash?" SEGAL asked, "Why?" The caller stated, "Because if you are going to do cash, I can swing by and grab it right now and just go up there and pay him and save you the

53

1  trip." SEGAL and the caller agreed that the caller would swing by in "10 minutes." As a
2  result of this intercepted call, I drove to SEGAL's residence, arriving at approximately
3  10:35 a.m. When I arrived, I observed a large male (approximately 6 feet tall and 230
4  plus pounds) standing at the trunk of a red sedan in front of SEGAL's garage. This
5  individual watched me intently as I drove past, and I discontinued surveillance shortly
6  thereafter. A subsequent DMV check for Robert Biddle displayed an individual whose
7  description matched that of the individual I had observed outside SEGAL's house.

8         x.       During an intercepted call on April 2, 2015, at 9:03 a.m.,
9  SEGAL arranged to meet with David LEPPO later that day at 11:30 in Del Mar. Agents
10 conducted surveillance of this meeting and observed SEGAL approach a vehicle
11 registered to David LEPPO. Agents observed a male seated inside LEPPO's vehicle who
12 appeared to match the DMV photo associated with David LEPPO. Agents observed
13 SEGAL reach into LEPPO's vehicle briefly and then depart shortly thereafter.

14        xi.      Based on intercepted conversations from April 7, 2015, agents
15 set up surveillance the following day (April 8, 2015) with the hope of observing SEGAL
16 transfer moeny to an individual tentatively identified as Dominic Johnson. On the
17 morning of April 8, 2015, agents attempted to surveil SEGAL as he traveled from Alpine,
18 CA, to a Circle K convenience store in San Diego's rural East County region.
19 Unfortunately, intercepted calls to and from **TT#1/SEGAL** reveal that SEGAL spotted
20 one of the vehicles in the surveillance team. SEGAL stated at 10:47 a.m. that, "I don't
21 know what's going on all of a sudden. I'm being followed." Later on at 10:53 a.m.,
22 SEGAL stated, "I took all the side roads. There must be a thing on my car again [likely
23 referring to a tracking device]." Indeed, it appears that SEGAL had his vehicle checked
24 for a tracking device shortly thereafter, as evidenced by SEGAL's intercepted statement at
25 1:09 p.m. on April 8, 2015, indicating that "I had my car checked just now and there's no
26 devices on it like before." During the next few hours and days, SEGAL informed a
27 variety of his associates about his belief that he had been followed. Moreover, during an
28

LSTV-TIII-PLEAD-15MC0291-000204

1  intercepted call just one week later, SEGAL discontinued taking illegal sports bets from
2  CS-1 as a result of the fact that he had been followed.

3      xii.    As set forth above, surveillance of SEGAL, when combined
4  with specific information obtained from intercepted conversations, has uncovered SEGAL
5  engaging in Criminal Activity.   However, even when directed by general information
6  obtained from intercepted conversations, physical surveillance of SEGAL has not always
7  established the precise nature and purpose of SEGAL's movements and activities, nor has
8  it always established the nature and purpose of the activities of SEGAL's associates.

9      xiii.   Furthermore, as summarized in paragraphs ix and xi above,
10 physical surveillance of SEGAL and his residence has already posed a significant risk of
11 revealing the existence of this investigation and thereby compromising our ability to
12 covertly obtain evidence of the Target Subjects engaged in Criminal Activity.   Based on
13 SEGAL's extreme and immediate reaction to the law enforcement surveillance that he
14 observed on April 8, 2015, and the negative impact that has already had on our
15 investigation, I believe that additional surveillance of SEGAL would pose a significant
16 risk of compromising our investigative goals.   The risk that additional surveillance would
17 pose to the investigation is particularly heightened where that surveillance is conducted in
18 the absence of contemporaneous wire interceptions that would otherwise help clarify the
19 purpose and timing of the Target Subject's movements.

20      b.    **Physical Surveillance of James TEAR:**   During many hours of
21 surveillance between April 2014 and the present, FBI Agents observed TEAR travel back
22 and forth between his residence and the LUCKY LADY multiple times and run occasional
23 errands, including the following examples:

24      i.    On April 9, 2014, FBI agents observed TEAR leave his
25 residence at 508 Alene Street in Spring Valley, California, pick up a small child at a
26 second residence, and then return to his home residence. Based on information provided
27 by CS-1, agents believe that TEAR is married and that he was picking up one of his own
28 children during this surveillance.   At approximately 4:50 p.m., agents observed TEAR

LSTV-TIII-PLEAD-15MC0291-000205

1  travel from his residence to the LUCKY LADY. It is unknown what activities TEAR
2  engaged in while at the LUCKY LADY on this particular day.

3          ii.      At approximately 12:17 p.m. on May 15, 2014, agents observed
4  TEAR drive from his residence to a commercial building at 7032 University Avenue, San
5  Diego. At approximately 12:28 p.m., TEAR walked from his vehicle and entered a hair
6  salon. At approximately 12:42 p.m., TEAR left the hair salon and walked to his vehicle.
7  Agents observed TEAR drive away from hair salon, but then lost sight of TEAR's vehicle.
8  The purpose of TEAR's visit to the hair salon is unknown, and it is unknown whether
9  TEAR met with anyone during his visit.

10          iii.     On March 25, 2015, agents conducted surveillance as a result of
11  intercepted text messages between TEAR and Ken KEO. In particular, on March 25,
12  2015, UC-2 delivered $2,500 to TEAR to deposit on UC-2's nephew's illegal sports
13  betting account. During that evening, TEAR exchanged multiple text messages with Ken
14  KEO about meeting with TEAR to collect this $2,500 deposit. As a result of these
15  intercepted text messages, agents surveilled Ken KEO as he traveled to the Pechanga
16  Casino in Temecula, at which point agents were not in a position to continue surveillance
17  without compromising the investigation.

18          c.    **Physical Surveillance of Stanley PENN:**  During many hours of
19  surveillance between April 2014 and the present, FBI Agents observed PENN drive to the
20  LUCKY LADY, the grocery store, the bank, and travel back and forth between his
21  residence and the LUCKY LADY on multiple occasions. Unfortunately, as with TEAR
22  and SEGAL, it is unknown what particular activities PENN engaged in while at the
23  LUCKY LADY on those particular days. Intercepted communications over the last 30
24  days, as well as information from CS-1, tend to support that PENN's movements typically
25  involve simple trips from his residence to the LUCKY LADY and then back again.

26          d.    **Physical Surveillance of Joe SPATAFORE:**  Agents attempted to
27  surveil SPATAFORE on multiple occasions throughout May and June 2015. On June 25,
28  2015, agents were able to positively identify SPATAFORE as he left his Del Mar

56

1   residence driving a white Mercedes Benz SUV registered in his name.  Agents observed
2   SPATAFORE drive to a local restaurant (Luce Bar and Kitchen at 1959 Morena Blvd. in
3   San Diego), stay less than two minutes, and then return to his residence.  Because of
4   concerns about compromising this investigation—which are based, in part, on Sanders
5   SEGAL'S observation of FBI surveillance agents on April 8, 2015—agents intend to
6   exercise caution and keep surveillance of SPATAFORE somewhat limited at this time.  I
7   believe that SPATAFORE, as a close associate involved in illegal activity with SEGAL,
8   would be highly conscious of surveillance.   SPATAFORE resides in an upscale
9   community within two blocks of the beach in Del Mar, California.  To do surveillance,
10  agents would be required to pick up SPATAFORE at the bottom of a dead-end alley, and
11  initiate surveillance from parked positions in a residential community where persons
12  sitting in vehicles for lengthy periods of time likely would arouse suspicion.  Surveillance
13  conducted in connection with wire interceptions would be less likely to compromise the
14  investigation and more likely to yield evidence of criminal activity.  For example, with the
15  benefit of contemporaneous wire interceptions, agents would have a more complete
16  understanding of the purpose of SPATAFORE's movements, as well as the timing of
17  those movements, which would allow for more effective surveillance while also limiting
18  the possibility of compromising the investigation.
19      97.   We have conducted numerous surveillance operations of SEGAL and other
20  Target Subjects.    While the information we obtained was helpful, without
21  contemporaneous intercepts of **TT#1/SEGAL**, surveillance alone will not allow us to
22  accomplish the goals of this investigation.   Unlike other criminal activity (i.e. drug
23  trafficking), there is nothing inherently illegal about the Target Subjects going to and from
24  the LUCKY LADY or carrying and exchanging documents or money.   Physical
25  surveillance of such activities only becomes useful if combined with the interception of
26  the Target Telephone in order to gather evidence regarding the purpose of the meetings
27  and exchanges, e.g., engaging in illegal gambling or transferring monetary proceeds from
28  illegal gambling operations.   As set forth in this affidavit, activity related to the illegal

LSTV-TIII-PLEAD-15MC0291-000207

gambling business often occurs within the physical confines of the LUCKY LADY, a location where legal activity also occurs. As such, an individual's mere presence at the LUCKY LADY, without more, is insufficient to establish that the individual is engaging in illegal activity. Furthermore, sustained physical surveillance within the LUCKY LADY itself is not feasible because an agent's extended presence within the LUCKY LADY would likely arouse suspicion and the amount of cash necessary to bank roll an undercover agent to "fit in" and gamble for extended periods of time would likely cost hundreds, if not thousands, of dollars per day. This is particularly true in light of the extensive video surveillance that the LUCKY LADY uses within its premises.

98.    Finally, as described above, Sanders SEGAL has demonstrated particular sensitivity to our efforts at physical surveillance and has conveyed that concern to a variety of other Target Subjects under investigation in this case. Based on my training and experience, this particularized sensitivity significantly increases the likelihood that our efforts at physical surveillance will compromise this investigation.

### D.   Stationary Video Surveillance Cameras

99.    Agents have considered using stationary video surveillance cameras as part of this investigations, including the following examples:

a.    **LUCKY LADY:** The LUCKY LADY employs security guards and security cameras to monitor its premises. According to an investigator with the California Department of Justice who has investigated the theft of poker chips at the LUCKY LADY, these security cameras capture activity that occurs both inside and outside the LUCKY LADY. Accordingly, although agents have considered installing a stationary video camera at the LUCKY LADY, they have decided against it because of the likelihood it would be detected and thereby undermine the investigation. Furthermore, even if it were feasible to install a stationary video camera at the LUCKY LADY without detection, it would be of limited value because it would not be able to capture the Target Subjects' interactions with others inside the LUCKY LADY. As set forth above, physical surveillance of the exterior of the LUCKY LADY has been of limited value and without

58

an audio recording of the interaction, it would be difficult or impossible to determine if meetings that occurred outside the LUCKY LADY were innocent or related to the Criminal Activity.

   b.   **TEAR's Residence:**  Agents have considered installing a stationary video camera at TEAR's residence, but decided against it because TEAR does not appear to meet regularly with customers or other co-conspirators at his home.  Indeed, other than a single instance on July 3, 2014, during which UC-2 discreetly exchanged $500 with TEAR in front of TEAR's residence, I am not aware of any other occasions when TEAR met with customers or other co-conspirators at his residence.  For every other monetary exchange between TEAR and UC-2 of which I am aware, TEAR arranged for UC-2 to pick up or deliver money within the LUCKY LADY's premises.   Thus, video surveillance at TEAR's residence appears unlikely to significantly assist this investigation. Even if a video surveillance camera was installed in the vicinity of TEAR's residence it is unlikely to meet all the goals of this investigation, particularly because such surveillance footage would not include audio recordings.  As noted earlier, because of the nature of this investigation, there is nothing inherently illegal about the Target Subjects in this case meeting or exchanging money.  Accordingly, without a contemporaneous audio recording, video surveillance showing a meeting between Target Subjects at TEAR's residence would be of limited value.

   c.   **SEGAL's Residence:** Since the last affidavit I submitted to the Court on April 14, 2015, we have continued to evaluate the feasibility of stationary surveillance at SEGAL's residence.  Installation of stationary surveillance is not feasible, however. SEGAL's neighborhood is monitored by security guards.  Indeed, on March 28, 2014, SDPD Detectives Dan Vile and D'Ann Carter had to cut short a trash cover they were conducting at PENN's house in the same neighborhood after a security guard observed them digging through the trash.  Moreover, during a call intercepted on March 21, 2015, PENN told SEGAL that he had observed two women from his condominium complex taking photos outside PENN's residence.  Furthermore, as described above, SEGAL

1  detected an FBI surveillance team on April 8, 2015, which increases the likelihood that
2  SEGAL will be even more vigilant in the future about surveillance and other activities
3  occurring near his residence.   Accordingly, agents are concerned that SEGAL would
4  detect the installation of a stationary surveillance camera near his residence. Furthermore,
5  as set forth above, physical surveillance of the exterior of SEGAL's residence has been of
6  limited value and without an audio recording of the interaction, it would be difficult or
7  impossible to determine if the comings and goings that occurred at SEGAL's residence
8  were innocent or related to the Criminal Activity.

9        d.   **Joe SPATAFORE's Residence:**   On May 27, 2015, at approximately
10  6:00 p.m., your Affiant and Detective Dan Vile conducted surveillance at 232 11th Street,
11  Del Mar, CA 92014, a residence believed to belong to Target Subject Joe SPATAFORE.
12  The residence appeared to be the rear and/or a detached residence located along with at
13  least one other residence on the same property.   Agents were unable to observe the
14  Mercedes vehicle currently registered to SPATAFORE parked on the street in the vicinity
15  of the residence, or in the alley at the rear of the residence. On June 1, 2015, your Affiant
16  again attempted to locate the Mercedes but the effort to locate the vehicle met with
17  negative results.   On June 10, 2015, at approximately 2:30 p.m., Detective Vile and
18  Detective D'Ann Carter located the Mercedes parked in a garage on the back portion of
19  the property.  The multiple checks of the property by your Affiant and detectives, have
20  successfully established that SPATAFORE's Mercedes was at least on one occasion seen
21  inside a garage at the residence.  The alley through which SPATAFORE must travel in
22  order to reach his residence is only a few feet from the residence and garage, and
23  placement of a stationary video camera at this location might compromise the
24  investigation.  The alley also ends in a dead end cul-de-sac, which would prevent your
25  Affiant and other investigators from readily driving into and out of the alley without risk
26  of compromising the investigation.

27      100.   The use of stationary video cameras is unlikely to assist agents in meeting the
28  goals of this investigation.  A stationary video camera frequently only provides limited

1   angles of view that may be of no assistance to law enforcement officers.   Even when
2   utilized, a stationary video camera is limited to recording, without audio portions, events
3   and persons seen at the location.   It is inherently stationary and incapable of providing
4   relevant observations of persons or Target Subject vehicles after they depart the area.
5   Further, a stationary video camera alone is unlikely to provide evidence of the entire scope
6   of this criminal enterprise.   While a stationary video camera is helpful in watching
7   locations, its use alone is not reasonably likely to succeed in dismantling this organization.
8   If agents develop information from the requested wire and electronic interception or other
9   sources that locations used by the Target Subjects are involved in illegal activities, your
10  Affiant will consider the installation of stationary video camera at those locations.

11      101.   In addition, the use of stationary video cameras cannot accomplish the goals
12  of this investigation because unlike other criminal activity (i.e., drug trafficking), there is
13  nothing inherently illegal about the Target Subjects meeting and exchanging money.   The
14  video recording of such meetings only becomes useful if combined with the interception
15  of the Target Telephone in order to gather evidence of the purpose of the meetings (e.g.,
16  money provided for illegal gambling operations).

17      **E.   International Leads**

18      102.   During this investigation, agents have requested information from FBI legal
19  attaches assigned to several different foreign countries.   These attempts either have been
20  unsuccessful at obtaining the requested information or have potentially compromised
21  portions of the investigation.   Your Affiant will continue to attempt to use FBI legal
22  attaches to further this investigation.   Your Affiant is currently reviewing the information
23  uncovered in this case to identify the possible out-of-country residences and business
24  locations for Target Subjects David LEPPO, Petter Magnus KARLSSON, and Pablo
25  Ballestero FRECH.   Your Affiant will request that FBI legal attachés discreetly attempt to
26  confirm those locations, as well as work with fellow law enforcement authorities to verify
27  the Target Subjects' use of various internet sites to commit crimes in violation of United
28  States gambling and money laundering statutes.

LSTV-TIII-PLEAD-15MC0291-000211

103.  For example, an August 29, 2014 request to the FBI legal attachés assigned to London for information about the betting website used by TEAR and UC-2 (www.stakestake.com) has gone unanswered as of July 9, 2015.[24]  Furthermore, albeit for different reasons, a similar request to the FBI legal attaché assigned to Panama City to discreetly obtain subscriber information for a Costa Rican telephone number with which **TT#1/SEGAL** was in contact more than 300 times between June 24 and December 8, 2014, has proven unsuccessful.  According to the FBI legal attaché assigned to Panama City, a law enforcement official associated with Costa Rica's Money Laundering Unit indicated during a September 9, 2014 interview that the Costa Rican telephone number was subscribed to an individual named Pablo Daniel Ballestero FRECH.  Unfortunately, around the time that the FBI legal attaché reported the results of his investigation to San Diego on December 16, 2014, all contact between **TT#1/SEGAL** and FRECH's number ceased.[25]  The timing of the report, in conjunction with the cessation of calls between **TT#1/SEGAL** and FRECH, is troubling and leads me to believe that additional inquiries may further compromise this investigation.

### F.  Interviews

104.  On September 26, 2014, CS-1 reported that on the prior day, he drove an individual named "Magnus" from the LUCKY LADY to another card room in Chula Vista.  Magnus claimed to be in the sports wagering business and told CS-1 that he was in town to meet SEGAL, an individual who Magnus believed to be the owner of the LUCKY LADY.  CS-1 further reported that Magnus was staying at the Howard Johnson Hotel on El Cajon Boulevard.  This interaction was not recorded, and CS-1 was never informed about the outcome of Magnus's meeting with SEGAL.  Based on CS-1's report, Detective

---

[24]  Based on information publicly available on the internet website www.whois.safenames.net, it appears that the domain name of stakestake.com is registered in the United Kingdom.

[25]  According to phone records as of March 10, 2015, the last contact between **TT#1/SEGAL** and FRECH's telephone number occurred on December 8, 2014.

LSTV-TIII-PLEAD-15MC0291-000212

Vile and I interviewed the Howard Johnson Hotel manager on October 2, 2014. The hotel manager advised that an individual named Petter Magnus KARLSSON had checked into the hotel on September 25, 2014. The hotel manager provided a scanned copy of the Swedish passport that KARLSSON had provided upon checking into the hotel. While KARLSSON was a guest at the hotel, the manager observed KARLSSON with an unidentified white male in a vehicle. According to the hotel manager, the vehicle had a California license plate number: 5CJB927. Subsequent records checks revealed that this plate was registered to Sanders SEGAL. Although the information provided by the Howard Johnson hotel manager was helpful to a certain extent, it does not accomplish all the goals of the investigation. Without contemporaneous wire intercepts, it is difficult if not impossible to establish the precise nature of KARLSSON's meeting with SEGAL and what KARLSSON's particular role is in connection with the Criminal Activity.

105. Based on intercepted conversations between Sanders SEGAL and Sydney SEGAL about placing money in a "blue bag," described above in paragraphs 43 and 49, I initially planned to interview Union Bank employees about the manner in which cash deposits arrive at the bank, whether these deposits arrive in colored bags, and whether Sanders SEGAL or Sydney SEGAL have been observed making any such deposits. Given recent additional financial analysis that illustrates the movement of more than $52 million through 12 Union Bank accounts associated with Stan PENN and/or the LUCKY LADY over the last two-and-a-half years, I believe that PENN is a particularly valued customer and this case might be compromised if a bank employee that I interviewed either intentionally or inadvertently leaked information to PENN. I believe the better course of action would be to conduct the interviews of bank employees at a later date. Furthermore, even if these subsequently conducted interviews do uncover additional information about Sanders SEGAL and Sydney SEGAL's activities depositing cash, intercepting **TT#1/SEGAL** will still prove invaluable in establishing that these particular cash deposits are illegal gambling proceeds, as opposed to cash proceeds generated from other sources.

LSTV-TIII-PLEAD-15MC0291-000213

106. On May 28, 2015, your Affiant and SDPD Detective Dan Vile interviewed SDPD Police Chief Shelley Zimmerman in connection with this investigation. Chief Zimmerman stated that, in January 2015, lobbyists Arkan SOMO and Alan Ziegaus wrote her to request a meeting regarding potential amendments to the San Diego Municipal Code, specifically those Code sections that regulate San Diego's Cardrooms. On February 26, 2015, Chief Zimmerman met with SOMO and Ziegaus to discuss these matters. During this meeting Chief Zimmerman's impression was that SOMO and Ziegaus were lobbying on behalf of both the Palomar Card Club and the LUCKY LADY. Somo and Ziegaus informed Chief Zimmerman that they wanted to have the Municipal Code changed to allow for a change in ownership of the card rooms. Chief Zimmerman indicated that she did not endorse any change to the Municipal Code and stated that she had conveyed this message to SOMO and Ziegaus, as well as various City Council members who had asked for her opinion on the matter. Although the information provided by Chief Zimmerman was helpful to a certain extent, it does not accomplish all the goals of the investigation. Without contemporaneous wire intercepts, it is difficult if not impossible, to establish the full extent of SOMO and Ziegaus's potential connection with the Criminal Activity in this case.

107. On June 8, 2015, your Affiant and Detective Dan Vile conducted an interview of a citizen source in San Diego, California, to gather further information about Target Subject Arkan SOMO. The source works as a member of San Diego's business community and is in a position to know other San Diego business persons, as well as elected officials in San Diego politics. The source advised that he/she was well-acquainted with SOMO, a fellow member of San Diego's "Chaldean" community. Based primarily on information that he/she learned from others in the Chaldean community, the source stated that he/she believed that SOMO had engaged in, and was continuing to engage in, bribery of public officials. The source stated that, from what he/she had heard within the Chaldean community, some of these bribery effort appeared to be related to efforts to change the "Grandfather Clause" that currently would prevent the sale of the

LSTV-TIII-PLEAD-15MC0291-000214

LUCKY LADY to new owners. Although the citizen source appears to have indirect access to significant information about SOMO's activities, it does not appear that the citizen source either directly observed or participated in those activities. In addition, it does not appear that the citizen source had insight into the inner workings of the illegal gambling business operating in close connection with the LUCKY LADY. Furthermore, the citizen source specifically asked that his/her identity remain confidential and did not indicate a desire to work on this investigation as a source or informant. Based on the foregoing, although the information provided by the citizen was useful, I do not believe that the citizen source can be used to accomplish all the goals of this investigation.

108. Based on my May 28, 2015 interview of Chief Zimmerman, as well as my June 8, 2015 interview with the citizen source described above, I have considered interviewing Arkan SOMO, Alan Ziegaus, and several San Diego City Council members. Because of the preliminary nature of our investigation into potential bribery and public corruption charges, as well as the likelihood that such interviews would cause these individuals to change their behavior or destroy evidence, I believe that conducting such interviews at this time would compromise our investigation.

109. On June 17, 2015, Agent Speller also advised me about a witness in the Palomar Card Club case that was supplying information about Imad SAMOUNA. On February 6, 2015, the witness was interviewed and reported to FBI agents that he/she met target subject SAMOUNA at the Village Club through Robert "Bob" Redmer and the late John Spatafore (a possible familial relation to Joe SPATAFORE). The witness stated it was common knowledge at the Village Club that SAMOUNA was a "bookie." The witness also stated that John Spatafore (deceased) went broke due to the fact that SAMOUNA and Spatafore were betting heavily and ended up losing a lot of money. Agent Speller advised that the witness was an employee at the Village Club for over 15 years, and volunteered his/her information to FBI agents. Agent Speller believed the witness' information to be reliable based on the above and because the information was corroborated by other sources and searches in the "Palomar" case. Although, as set forth

65

above, the witness has provided some useful background information about SAMOUNA (as well as an individual, now deceased, who might have been a relative of Joe SPATAFORE), the information that this witness has provided is several years old, dating back to the time when he/she previously worked at the Village Club. The witness's information was based primarily upon his/her observations while working at the Village Club, and he/she no longer has this access because he/she no longer works there. Furthermore, this witness has never worked at the LUCKY LADY and, therefore, would not have the same sort of insight into the operations of that card room. In sum, this witness will not be able to accomplish all the goals of this investigation.

110. I have considered interviewing other gambling customers of the Target Subjects, but have elected not to do so because this tactic would risk exposing the investigation. The full list of the Target Subjects' gambling customers is unknown at this point. Furthermore, without additional information about these customers, it is unclear at this point which customers, if any, would have an incentive to cooperate with our investigation and which customers would be most likely to alert the Target Subjects about our investigation.

111. I have not identified any other individuals, other than the Target Subjects themselves, who would be suitable to interview about the Criminal Activity of the Target Subjects. I continue to believe that interviewing the Target Subjects themselves would not be productive because I believe it to be unlikely that they would voluntarily and truthfully provide information regarding their Criminal Activities, and because approaching them would alert the Target Subjects to our interest in their activities, thereby potentially exposing the broader investigation.

112. I will continue to look for opportunities to interview those with information about the Target Subjects and their Criminal Activity. I will do so only when we have adequate assurances that it will not compromise our investigation.

LSTV-TIII-PLEAD-15MC0291-000216

### G.   Subpoenas/Other Court Orders

113.   This investigation has used a variety of pen register and trap and trace orders, as well as grand jury subpoenas, as discussed below. I have also considered using the grand jury to take testimony, but have decided against this investigative tool thus far. An overt grand jury investigation would not be practical at this point. For example, should the Target Subjects be called to testify, they would most likely invoke their Fifth Amendment privileges. It would be unwise to seek grand jury immunity for any of the Target Subjects named herein, as it might foreclose prosecution of the most culpable persons and compromise the investigation. Moreover, any grand jury inquiries at this time might drive the Target Subjects to conceal their activities more carefully, lead to the destruction of evidence, or cause the Target Subjects or their co-conspirators to flee the jurisdiction of the Court.

### a.   Grand Jury Subpoenas

114.   Agents have used about 30 grand jury subpoenas during this investigation, including the following examples.

i.   <u>Telephone Records</u>: We have issued fourteen grand jury subpoenas for information from telephone companies, such as AT&T Wireless and Verizon Wireless. While the subpoenaed records have provided some useful information, none of the grand jury subpoena returns have been sufficient to achieve all of our goals. For example, on March 28, 2014, and May 2, 2014, we issued grand jury subpoenas to Verizon Wireless for the ESN, as well as the subscriber, billing and toll records for **TT#1/SEGAL**. However, although SEGAL uses **TT#1/SEGAL**, the telephone records are in the name of David Mikovich, a deceased individual and former friend of SEGAL's. This illustrates the limitations of business records. Without information from CS-1 and contemporaneously recorded calls, it likely would have been difficult to definitively link SEGAL to **TT#1/SEGAL**. Likewise, on May 20, 2015, for example, we issued a grand jury subpoena to TracFone Wireless, Inc., d/b/a Simple Mobile for the subscriber, billing and toll records for the telephone number 424-345-0781 (believed to be used by Target

LSTV-TIII-PLEAD-15MC0291-000217

1  Subject Joe SPATAFORE).  The records from TracFone, however, do not identify the
2  identity of the subscriber of that telephone number.

3            ii.    <u>Western Union</u>:  On April 9, 2015, grand jury subpoenas were
4  issued to Western Union for wire transfers sent to or from Target Subjects Sanders
5  SEGAL, Stanley PENN, Sydney SEGAL, David LEPPO, Petter Magnus KARLSSON,
6  and Pablo Ballestero FRECH, as well as other persons and locations targeted in the case.
7  The records from Western Union, which were received on April 10, 2015, were helpful in
8  establishing an association between one and more of the Targeted Subjects, but these
9  records did not identify the underlying purpose of the monetary transactions.  Without
10 contemporaneous wire interceptions it will be difficult, if not impossible, to determine the
11 underlying purpose of any particular wire transfer and whether or not that wire transfer
12 relates to illicit activity.  A Grand Jury subpoena also was served for the records of Joe
13 SPATAFORE, with negative results.

14            b.    <u>Pen Register Orders</u>

15      115.  Since May 7, 2014, we have obtained approximately 39 pen register and trap
16 and trace orders, including for **TT#1/SEGAL**, through which we have obtained subscriber
17 information and toll records for telephones used by the Target Subjects and associates of
18 the Target Subjects or related telephones.  While these toll records have helped identify
19 individuals who communicate frequently with SEGAL, including Sydney SEGAL and
20 Stan PENN, this traditional technique is of little help without the aid of wire and
21 electronic interceptions. This is because such toll records do not show the content of any
22 calls or text messages, and thus cannot by themselves prove any criminal acts.  It is also
23 difficult to determine which calls are criminal in nature.  Moreover, we have examined,
24 and continue to examine, this data to try and determine circumstantially who is associated
25 with whom; to identify likely criminal associates; to try to identify centrally called
26 numbers (which may indicate a "command and control" telephone); and to link telephones
27 (and therefore, circumstantially, persons) to specific significant events.  We also have
28 checked, and continue to check, telephone numbers encountered in this investigation

68

against databases to identify crossovers with other investigations (e.g., if the telephone was encountered or contacted in another separate investigation). As part of these analyses, we have learned, for example, that Target Subject Joe SPATAFORE has contacted at least one other individual (Imad Samouna) suspected of bookmaking and related criminal activity in connection with another criminal investigation. However, despite these analyses, we have not achieved all of the goals of the investigation, and I do not believe continued telephone analysis, alone, or in combination with the other investigative techniques we have used, will accomplish these objectives. Telephone analysis already has limited usefulness as an investigative tool because it provides no information about communication content (indeed, from analysis alone, we cannot even state with certainty who participated in a conversation). At best, it circumstantially ties others to the Criminal Activity, because they frequently contact a telephone known to be used for criminal purposes or by a person known to be engaging in the Criminal Activity, or because they had contact with such a telephone during a particularly significant time. Such information, alone, is insufficient to accomplish the objectives above. But even that analysis depends on knowing who uses particular telephones. Many telephones we have encountered in this case have false or no subscriber information, are prepaid (and therefore do not have billing information or bills sent to a particular location), and/or are mobile (or, stated otherwise, are not hardwired to a fixed location). Nevertheless, since April 14, 2015, we have obtained three additional pen registers (initial pen registers for Sydney SEGAL and Joe Spatafore, as well as an updated pen register for Stanley PENN), and we will continue to evaluate the usefulness of obtaining new pen registers over the next period of interception.

### H.   Financial Investigation

116. Agents have conducted financial investigations into bank accounts, wire transfers, and the like, where possible. We have issued approximately six grand jury subpoenas to financial institutions, including the following examples.

a.    PENN's Union Bank Accounts:   On May 20, 2014, agents observed Stanley PENN travel to Union Bank at 6010 El Cajon Blvd. in San Diego. PENN was observed carrying papers into the bank and leaving the bank with a brown leather folder. In July 2014, we issued a grand jury subpoena to Union Bank for all accounts in the name of Stanley PENN. In response to the subpoena, we obtained records for twelve different bank accounts. PENN is listed as a signatory for all twelve accounts, and eight of those accounts are in the name of Stanley PENN, dba Lucky Lady Casino, dba Lucky Lady Card Room. Among other things, these subpoenaed records provide evidence of PENN's involvement in the Criminal Activity, but do not fully illustrate the involvement of the other Target Subjects, as described below:

i.    Large Volume of Cash Deposits/Withdrawals:   The bank records show a large volume of cash deposits and withdrawals, which is consistent with many customers settling accounts for wagering losses and PENN withdrawing cash to settle wagering payouts. For example, in connection with just one of the twelve accounts for which records were provided (Account #0110003536), cash withdrawals of $250,000 and cash deposits of $402,154 were conducted over the course of more than a dozen transactions during a single month in January 2013. This activity—denoted on bank records as "CCV Deposits" and "CCV Orders" (withdrawals) and conducted through a cash truck delivery system, according to bank employees—appears to be relatively consistent throughout the time period covered by the grand jury subpoena. During the month of June 2014, for example, the same account referenced above had a total of $200,000 in cash withdrawals and a total of $403,374 in cash deposits over the course of more than a dozen transactions. These large cash deposits and withdrawals are consistent with the activities of an individual engaged in money laundering. Unfortunately, without contemporaneous wire intercepts, it is difficult if not impossible to know what portion of this cash relates to legitimate activities conducted at the LUCKY LADY, as opposed to the illegal gambling business currently under investigation.

70

1          ii.          Movement of Funds Between Accounts:     In addition to
2  depositing and withdrawing large amounts of cash, bank records reflect that PENN
3  regularly moves hundreds of thousands of dollars between his twelve different Union
4  Bank accounts.  On January 7, 2013, for example, PENN wrote a $400,000 for "cash"
5  from one of his accounts (Account #0110031505) and then deposited this $400,000 check
6  into a second account of his (Account #0110003536).  The following day, on January 8,
7  2013, PENN wrote a $500,000 check for "cash" from this second account (Account
8  #0110003536) and deposited that check into a third account (Account #0111853552).
9  During the next month, PENN wrote himself checks from this third account (Account
10  #0111853552) for "cash" in the amount of $50,000 on January 18, 2013, and $100,000 on
11  February 13, 2013.  During this same time period, on February 4, 2013, PENN wrote a
12  $15,000 check from this third account (Account #0111853552) for "cash" and deposited it
13  into a fourth account (Account #0111782629).  This activity is consistent with an
14  individual engaged in "layering," i.e., attempting to conceal the origin of illegally
15  generated cash proceeds, and agents have not uncovered any other explanation for these
16  kinds of monetary transfers.  Without contemporaneous wire intercepts, however, it is
17  difficult if not impossible to conclusively establish the purpose of these large monetary
18  transfers or the ultimate destination of the large cash payouts that have occurred shortly
19  after these large monetary transfers.

20          iii.          On April 9, 2015, to supplement the bank records already
21  obtained from January 2013 to May 2014, an updated subpoena was issued to Union Bank
22  for all account information in the name of Stanley PENN from June 2014 to the present.
23  Results have since arrived and are in the process of being analyzed.  Preliminary analysis
24  of the records of the twelve Union Bank accounts associated with PENN and the LUCKY
25  LADY show that, between approximately January 2013 until approximately March 2015,
26  more than $52 million was deposited and withdrawn from these accounts.  Tracking of
27  individual deposits identified multiple instances in which funds were transferred from one
28  related bank account to another, including multiple instances where funds were transferred

LSTV-TIII-PLEAD-15MC0291-000221

between as many as five related bank accounts for no readily identifiable business purpose.  These kinds of transfers, as noted above, are consistent with an individual engaged in "layering," i.e., attempting to conceal the origin of illegally generated cash proceeds, and agents have not uncovered any other explanation for these kinds of monetary transfers.  Without contemporaneous wire intercepts, however, it is difficult if not impossible to conclusively establish the purpose of these large monetary transfers or the ultimate destination of the large cash payouts that have occurred shortly after these large monetary transfers.

> b.   Union Bank Account for Sanders SEGAL

117.  On March 9, 2015, a grand jury subpoena was issued for any Union Bank accounts held in Sanders SEGAL's name.  In response to this request, Union Bank produced only a few pages of bank records from November 2013 to December 2013 showing two $50 transactions.

> c.   Bank Accounts for Joe SPATAFORE

118.  In June 2015, a grand jury subpoena was issued to JPMorgan Chase and Wells Fargo for any accounts held in Joe SPATAFORE's name.  Results remain pending from JP Morgan Chase.  In June 2015, Wells Fargo produced records for one account in the name of Joe SPATAFORE, ranging from January 2014 to May 31, 2015.  A request for supplemental production of more detailed records remains pending.  Preliminary analysis of the records already produced shows tens of thousands of dollars in deposits and withdrawals, including an $18,250 payment in both 2014 and 2015 to an individual identified as Michael Gross.  Although the account shows regular monthly health insurance payments to Blue Cross Blue Shield, other normal living expenses (i.e., grocery store, gas station, and other retail expenses) do not appear to be coming out of this account. Without contemporaneous wire interceptions, it is difficult (if not impossible) to determine which, if any, of SPATAFORE's monetary transactions are related to illegal activity.

119.  Given that the LUCKY LADY and the Target Subjects appear to operate largely on a cash basis, I believe the financial investigation is unlikely to achieve all our goals.  As noted earlier, without contemporaneous wire intercepts, it is difficult if not impossible to know what portion of this cash relates to legitimate activities conducted at the LUCKY LADY, as opposed to the illegal gambling business currently under investigation.  Furthermore, it will be difficult or impossible to identify all of the organization's money in the United States, since each betting customer potentially has a separate bank account with money related to the Criminal Activity and some of the money may not be held in financial institutions at all.  Indeed, SEGAL often deals with CS-1 directly in cash, without any financial institution acting as intermediary.

I.      **Searches and Seizures**

120.  The FBI has acquired the gambling payouts from TEAR to UC-2 and from SEGAL to CS-1.  On July 3, 2014, TEAR made a $500 hand-to-hand cash payment to UC-2.  On February 3, 2015, SEGAL made a $3,150 payment to CS-1.  Likewise, on February 25, 2015, SEGAL made a $500 hand-to-hand cash payment to CS-1.  On March 25, 2015, CS-1 collected $500 from SEGAL at the LUCKY LADY.  Furthermore, on June 11, 2015, UC-2 collected $1,465 from TEAR at the LUCKY LADY.  In addition, the FBI has acquired gambling payouts in the form of online credits to the bookmaking websites that UC-2 and CS-1 established in this case (stakestake.com and just4bettors.com).  While these seizures have provided evidence of the Target Subjects' illegal bookmaking, they did not reveal the identities and roles of all co-conspirators who assist with the illegal bookmaking business, the volume and geographic scope of the illegal bookmaking business, the manner and means of any money laundering activities, including the total quantities of illegal gambling proceeds collected and laundered, and how the illegal gambling proceeds are laundered.

121.  In addition, I have consulted with FBI agents who executed search warrants related to a San Diego-based illegal gambling business whose targets were customers of the Palomar Card Club.  In connection with that investigation, the FBI executed search

warrants at the Palomar Card Club on October 29, 2014.  Since search warrants were executed at the Palomar Card Club, several of the targets have begun playing cards legally at the LUCKY LADY, and one of the Palomar Card Club's card dealers has begun working as a card dealer at the LUCKY LADY.  Moreover, as set forth above, it also appears that individuals associated with the Palomar Card Club and the LUCKY LADY may have hired the same lobbying firm in an attempt to change existing San Diego laws that currently prohibit the sale of these card rooms to new owners.  Although some of the targets now play cards at the LUCKY LADY and know our Target Subjects socially, and although the two card clubs both have the same incentive to change existing San Diego laws that regulate the card rooms, the two illegal gambling businesses appear to be separate business enterprises.  Indeed, according to the case agents for the Palomar investigation, they have uncovered no evidence during the search of the Palomar Club or any other locations searched that relates to the LUCKY LADY or any of the Target Subjects.  Accordingly, the searches and seizures conducted at the Palomar Card Club cannot accomplish all the goals of this investigation.

122.  I have considered conducting a search warrant on the LUCKY LADY and residences belonging to SEGAL, and the other Target Subjects.  Search warrants of these locations would almost certainly disclose the fact that the Target Subjects are currently under investigation.   Given the Target Subjects' demonstrated sensitivity to law enforcement scrutiny—i.e., the dropped Costa Rican telephone number of Pablo FRECH, TEAR's apparent suspicions regarding UC-1,  and SEGAL's concerns about surveillance, all of which are described in greater detail above—our ability to further investigate the Target Subjects would be seriously hindered, because anyone not immediately arrested would likely flee, move, destroy evidence, discard telephones, break off criminal contact and communication with those arrested and others, adopt new identities, and/or be even more conscious of law enforcement scrutiny.  However, should the current circumstances change, or in the event the opportunity arises, agents would consider using search warrants/seizures to further the goals of this investigation.

LSTV-TIII-PLEAD-15MC0291-000224

### J.    Trash Searches

123.    SDPD Detectives Dan Vile and D'Ann Carter have conducted or attempted to conduct several trash searches in connection with this case, including the following examples.

124.    On March 28, 2014, at approximately 4 a.m., Detectives Vile and Carter, conducted a trash cover on Stan PENN's residence at 4216 Collwood Lane, San Diego. They uncovered only personal items such as drycleaning receipts and toiletry containers. They uncovered nothing of significance, such as pay/owe sheets, bank money wrappers, bank statements, etc.    Later on the same day, Detectives Vile and Carter attempted to conduct a trash cover at Danny HUYNH's residence at two separate times, 4:20 a.m. and 11:20 a.m, but were unsuccessful because HUYNH's trash had not yet been placed outside for pick-up.

125.    Detectives Vile and Carter also attempted to conduct trash covers on Sanders SEGAL's residence on March 28, 2014, and on April 3, 2014.    These efforts were unsuccessful because SEGAL's trash had not yet been placed outside for pick-up. Furthermore, during the March 28, 2014 trash search at Stan PENN's residence, a security guard observed Detectives Vile and Carter going through PENN's trash and drove by slowly until Detectives Vile and Carter left the area.    In light of this security presence, additional trash searches were deemed too dangerous to employ at PENN's residence or at SEGAL's residence, as both reside in the same condominium complex and would be likely to learn if agents conducted additional trash runs at their residences.

126.    Agents considered conducting a trash search at James TEAR's residence, but elected not to do so both because it was unlikely to further the goals of the investigation and because it might compromise the investigation.    TEAR lives in a relatively compact community in Spring Valley, California, such that TEAR or his neighbors would be likely to observe if plain clothes police officers were rifling through TEAR's trash. Furthermore, because TEAR resides in Spring Valley (outside the city of San Diego), agents connected to this investigation do not have the same longstanding relationships

with trash collectors in TEAR's area as they do in San Diego. I consulted with the agent who runs the East County Regional Gang Task Force, and he likewise is not aware of a confidential or discreet contact with any East County trash collector who might be able to conduct a trash cover at TEAR's residence. Accordingly, I am concerned that requesting a trash search from the trash collectors who service TEAR's residence may cause the trash collectors to alert TEAR about the trash search and thereby compromise the investigation. Finally, because TEAR appears to conduct his illegal bookmaking activities within the LUCKY LADY, it seems unlikely that TEAR's trash will contain any items of significance. In sum, after weighing the costs and benefits of searching TEAR's trash, agents have elected not to employ this tactic.

127. On March 28, 2014, Detectives Vile and Carter attempted to conduct a trash search at the LUCKY LADY, but were unable to do so because the trash at that facility is locked.

128. On June 23, 2015, SDPD Detective Vile and Special Agent McCall conducted a trash search at SPATAFORE's residence. They located household trash, consisting of cigars and a wine bottle, as well as a Rite Aid Pharmacy prescription bag in the name of Joseph SPATAFORE, which was dated June 16, 2015. This confirms SPATAFORE's residence at this location, but does not accomplish all the goals of the investigation. Your Affiant will continue to review the possibility of a trash search at SPATAFORE's residence, as is feasible.

### K.   Computer Surveillance

129. Agents have used computer surveillance techniques on several occasions, including the following examples.

a.   **Undercover Betting Accounts:**  On July 17, 2014, TEAR provided UC-2 the login and password for a betting account on www.stakestake.com. In addition, in May 2015, NGUYEN provided UC-2 with the login and password for a betting account on www.rain777.ag. Similarly, in August 2014, with the help of Target Subject BURKE, CS-1 was provided the login and password for a betting account on

1   www.just4bettors.com.  Since then, we have placed many bets on these accounts, which
2   has helped establish credibility and aided our undercover efforts, as already discussed
3   above.  However, UC-2 and CS-1 only have access to these accounts as individual
4   customers and, therefore, do not have access to the broad information and data that would
5   establish the full scope of the Target Subjects' Criminal Activity.  As described above,
6   UC-2 is limited to being a customer of TEAR and other Target Subjects and is not in a
7   position to learn the volume and geographic scope of the illegal bookmaking business, the
8   manner and means of any related money laundering activities, including the quantities of
9   illegal gambling proceeds collected and laundered, or how the illegal gambling proceeds
10  are laundered.  Likewise, as set forth above, CS-1's ability to further the goals of this
11  investigation is similarly limited.

12        b.    **Betting Websites:**    The StakeStake website (www.stakestake.com)
13  and the Just4Bettors website (www.just4bettors.com) have provided some relevant
14  information.  However, the server for just4bettors.com appears to be maintained in Costa
15  Rica, and the server for StakeStake.com appears to be maintained in the United Kingdom.
16  Furthermore, the sports betting websites identified during the last 30 days of intercepts—
17  including goldactionsports.com, Play888.com, and BetMex.net—are likewise registered in
18  foreign countries.  According to a publicly accessible website (who.godaddy.com) that
19  records registrant information for internet domain names, goldactionsports.com appears to
20  be registered in Costa Rica, while BetMex.net appears to be registered in Hong Kong, and
21  Play888.com appears to be registered in the Republic of Korea.  In sum, none of the
22  betting websites that I have identified so far in connection with this investigation appear to
23  fall within the United States' jurisdiction.  Therefore, we cannot serve any subpoenas to
24  the website to obtain information on SEGAL, TEAR, or the other Target Subjects.  Even
25  if it were possible to serve a grand jury subpoena on the betting websites described above,
26  doing so might alert the Target Subjects of the investigation, cause them to change tactics,
27  lead to the destruction of evidence or cause them to shut down their operations.  The
28  danger of alerting the Target Subjects in this manner became manifest earlier in the

77

investigation when, as described above, an inquiry to Costa Rican authorities about the identity of a subscriber with whom SEGAL had frequent contact coincided with the subscriber dropping that phone.   Furthermore, in my training and experience, if law enforcement attempted to directly access these betting websites, for example by using login and password information obtained through intercepted phone calls, such access by law enforcement would create a record which would be apparent to the individual whose account was accessed.   Accordingly, because it might compromise the investigation, I do not believe it would be prudent to access any of the accounts currently used by the Target Subjects in this case.

       c.   **E-mail Investigation:**   We have not yet identified any e-mail addresses that the Target Subjects use in connection with the Criminal Activity.[26]   The Target Subjects appear to communicate with each other by telephone or in person. Indeed, TEAR and SEGAL have always contacted UC-2 and CS-1 by telephone or in person. If we identify any relevant e-mail addresses in this investigation, we will consider obtaining an e-mail search warrant or employing computer surveillance techniques that reveal such information as the to/from address of e-mail messages, the Internet Protocol (IP) addresses of websites visited, and the total amount of data transmitted to or from an account.

---

[26]   In 2007, Petter Magnus KARLSSON provided the email address snosse1@hotmail.com in connection with his application for a Swedish passport. Furthermore, telephone subscriber records show that the email address associated with Danny HUYNH's cellular telephone is linhh82@gmail.com. This investigation has not yet uncovered any evidence that suggests the Target Subjects currently use these email accounts or that the Target Subjects have ever used these email accounts in connection with conducting Criminal Activity. Furthermore, during an intercepted call on March 30, 2015, SEGAL provided an email address (sandys619@yahoo.com) when placing a call to get the carpets cleaned at his residence.   Agents have not uncovered any evidence, however, that suggests that SEGAL has used this email address to conduct Criminal Activity.   If we do uncover such evidence, we will consider obtaining an email search warrant.

LSTV-TIII-PLEAD-15MC0291-000228

## L.   **Tracking Devices**

130.   Agents have used or considered tracking techniques, including the following examples:

a.   **Telephone Tracking:** As part of some of the pen register and trap and trace orders discussed above, I obtained cell site data for James TEAR and Jeffrey BURKE.   Some of the cell site data was obtained without a warrant and this affidavit is not relying upon that cell site data for probable cause.   Other cell site data, including cell site data obtained with regard to James TEAR from May 6, 2014, to June 18, 2014, was obtained pursuant to a tracker warrant and is summarized below.   In reviewing this cell site data, I used Google map coordinates that Sprint provided to the FBI to provide an approximate location of the target telephone based on the triangulation of cell site data.   I reviewed a variety of data points during the period May 6, 2014 to June 18, 2014, which illustrated that TEAR's cell phone participated in a pattern of movement consistent with TEAR staying at his home at 508 Alene Street, in Spring Valley, California, and traveling to the LUCKY LADY to work the evening night shift at the Card Room.   In addition to these consistent trips between TEAR's home and the LUCKY LADY, cell site data associated with TEAR's cell phone also showed that the phone occasionally traveled to other locations in and about San Diego County.   The data, however, does not provide an exact location for the phone (or the user).   Accordingly, the data does not provide an exact address or location that would allow investigators to positively identify TEAR's location.   The data further does not allow for investigators to determine the purpose or nature of TEAR's movements, or to determine whether TEAR engaged in meetings or conversations with other co-conspirators for the purpose of bookmaking or money laundering activities.   Without Title III electronic interceptions the data would not allow investigators to determine the purpose or nature of TEAR's movements to those locations.

b.   In addition, beginning on March 16, 2015, and continuing to approximately April 14, 2015, I obtained cell site data related to **TT#1/SEGAL** as part of this Court's March 16, 2015 order authorizing interception of communications to and

LSTV-TIII-PLEAD-15MC0291-000229

from **TT#1/SEGAL**. This cell site data has been of limited use because it only provides the location of **TT#1/SEGAL** when the phone is in use and it only provides general location data within a one-mile radius of the phone's location. Indeed, even when using cell site data associated with **TT#1/SEGAL**, I and other agents have had success in surveilling SEGAL's Criminal Activity, described above in paragraphs 96(a)(vi) through 96(a)(xi), primarily because of specific information obtained from intercepted communications to and from **TT#1/SEGAL**.

c.      Beginning on May 9, 2015, and continuing until June 21, 2015, Agent McCall obtained GPS data associated with the telephone number 619-300-1344 (subscribed to Syd SEGAL). By reviewing select portions of the more than 4,000 data points provided by AT&T, Agent McCall determined that Syd SEGAL spent significant time at locations at or near the LUCKY LADY, as well as locations at or near his residence. Without contemporaneous wire interceptions, Agent McCall was not able to determine if the movements he reviewed were connected to illegal activity.

d.      **Vehicle Tracking Device:**   We have considered using a vehicle tracking device for the Target Subjects' vehicles; however, since UC-2 was successfully introduced into the investigation, we did not want to jeopardize the UC or risk exposing the investigation if the tracking device was discovered. This concern is further justified by events on April 8, 2015, when SEGAL detected an FBI surveillance team observing his movements. As a result of these events, as described above, SEGAL expressed concern that, "There must be a thing on my car again [likely referring to a tracking device]." Indeed, it appears that SEGAL had his vehicle checked for a tracking device shortly thereafter, as evidenced by SEGAL's intercepted statement at 1:09 p.m. on April 8, 2015, indicating that "I had my car checked just now and there's no devices on it like before." Based on SEGAL's expressed concerns regarding a tracking device, as well as his efforts to locate such a device on his vehicle, agents believe that installing a tracking device on SEGAL's vehicle likely would compromise this investigation. SEGAL's apparent interest in informing a wide variety of his associates about these tracking concerns likewise

80

1  suggests that SEGAL's concerns would almost certainly be shared by the other Target
2  Subjects of this investigation, including Joe SPATAFORE.   Furthermore, according to
3  crossing records, over the last year SEGAL has traveled on numerous occasions to
4  Mexico, almost on a weekly basis, and a tracking device could not be used to monitor
5  SEGAL's whereabouts in a foreign country.  Moreover, as set forth above with regard to
6  this particular investigation, a Target Subject's mere presence at a particular location,
7  without a contemporaneous audio recording or intercept to establish the purpose of the
8  Target Subject's presence, is of limited value.

9  ## M.   Mail Covers

10  131.  SDPD Detective Dan Vile conducted a mail cover on Stan PENN's former
11  residence in San Vicente in 2007.  Although friends and relatives sent PENN mail to that
12  address and mail to other Target Subjects was received at that address, nothing relevant
13  was uncovered in that mail cover.

14  132.  Special Agent Kobey McCall submitted to the U.S. Postal Inspector's Office,
15  a request for mail cover on the residence of Joe SPATAFORE, 232 11th Street, Del Mar,
16  California.  On June 22, 2015, Agent McCall received confirmation that the U.S. Postal
17  Inspector's Office had received the mail cover request and would process it.  Results
18  remain pending.

19  133.  On February 27, 2015, I requested a mail cover for residences or addresses
20  associated with SEGAL, TEAR, KEO, and PENN.  On March 23, 2015, I was advised
21  that the mail cover had been initiated on March 18, 2015.  On June 12, 2015, I reviewed
22  materials obtained as a result of the mail cover on TEAR, but found no materials that
23  would be helpful in furthering this investigation. On June 8, 2015, the U.S. Postal Service
24  confirmed that a mail cover had been initiated on SEGAL and PENN, but that it had not
25  yet sent any materials to your Affiant because it had deemed the materials to be minimal
26  in nature; the U.S. Postal Service has agreed to send these materials to your Affiant,
27  though none of these materials have arrived as of June 12, 2015.  Likewise, on June 8,
28  2015, the U.S. Postal Service confirmed that a mail cover request had been sent to Spring

LSTV-TIII-PLEAD-15MC0291-000231

1   Valley with regard to KEO, but that apparently no record of that mail cover request
2   currently exists at the Spring Valley Post Office; the U.S. Postal Service has agreed to
3   initiate a new mail cover on KEO.

4       134.   Although mail covers can be useful tools, they are unlikely to achieve all of
5   the goals of this investigation.   A mail cover does not reveal the substance of any
6   correspondence and even the sender and addressee can be falsified.   Furthermore, at this
7   time, there is no indication that SEGAL or the other Target Subjects are using the mail to
8   conduct illegal bookmaking or other criminal activities.   However, should the current
9   circumstances change or in the event the opportunity arises, agents would consider using
10   additional mail covers to further the goals of this investigation.

11             **N.**   **Other Wiretaps and Investigations**

12       135.   I am aware that the FBI is currently conducting an investigation into an
13   illegal gambling business that operated in close connection with the Palomar Card Club in
14   San Diego.   Over the course of the past year, FBI agents have intercepted wire and
15   electronic communications between multiple targets who run this enterprise.   The targets
16   of that investigation were customers of the Palomar Card Club.   Since search warrants
17   were executed at the Palomar Card Club on October 29, 2014, several of the targets have
18   begun playing cards legally at the LUCKY LADY, and one of the Palomar Card Club's
19   card dealers has begun working as a card dealer at the LUCKY LADY.   Moreover, as set
20   forth above, it also appears that individuals associated with the Palomar Card Club and the
21   LUCKY LADY may have hired the same lobbying firm in an attempt to change existing
22   San Diego laws that currently prohibit the sale of these card rooms to new owners.
23   Although some of the targets now play cards at the LUCKY LADY and know our Target
24   Subjects socially, and although the two card clubs both have the same incentive to change
25   existing San Diego laws that regulate the card rooms, the two illegal gambling businesses
26   appear to be separate business enterprises.   Furthermore, although CS-1 previously
27   exchanged gambling payments with Ryan BUCHARDT near the Palomar Card Club, I am
28   not aware of any of this investigation's Target Subjects who have been intercepted as part

of the investigation into the illegal gambling business at the Palomar Card Club. Furthermore, I am not aware of any targets of the Palomar investigation or the individuals intercepted in connection with the Palomar investigation who are Target Subjects in this investigation. In addition, interceptions in connection with the Palomar investigation have terminated for the time being. Accordingly, while there is some possibility that the Palomar investigation could obtain limited intercepts of the Target Subjects in the future, there is still a need for independent interception of **TT#1/SEGAL** and **TT#3/SEGAL**. The Palomar investigation cannot accomplish the goals of this investigation because it is focused on other targets and is not directly concerned with the successful prosecution and dismantlement of the illegal gambling business led by SEGAL and operating at or in close connection with the LUCKY LADY.

136. Based on conversations in March 2015 and April 2015 with Special Agent Stephen Duncan of the California Department of Justice, I am aware that the California Department of Justice has conducted at least three investigations at the LUCKY LADY, all of which were initiated at the request of LUCKY LADY manager Jan Beverley. These three investigations involved concerns about: (1) child endangerment based on a gambling customer leaving a child unattended in a vehicle outside the LUCKY LADY; (2) theft of poker chips; and (3) an employee impermissibly exchanging chips for cash without gambling in the interim. The California DOJ's investigation cannot accomplish the goals of this investigation because: (1) none of these three investigations is currently active; and (2) all three of these investigations focused on other targets and activity and is not directly concerned with the goals of this investigation. On June 24, 2015, I contacted SA Duncan, who advised me that there were no new California Department of Justice investigations being conducted at the LUCKY LADY.

137. As set forth in **Appendix A**, Imad SAMOUNA previously was intercepted in connection with two wiretaps in the Eastern District of Michigan in 2006, both of which arose in connection with illegal gambling investigations. SAMOUNA was overheard or intercepted in connection with both of these wiretaps, but no indictment was sought

LSTV-TIII-PLEAD-15MC0291-000233

1   against him. Because both of these wiretaps expired more than eight years ago in 2006

2   and were geographically centered in Michigan, these wiretaps cannot accomplish all the

3   goals of the current investigation based in San Diego.

4              **O.**   **Continued Need to Intercept TT#1/SEGAL**

5      138.  In order to meet the goals of this investigation set forth in paragraph 9 of this

6   affidavit, I believe it is necessary to continue to intercept wire and electronic

7   communications to and from **TT#1/SEGAL**.  As set forth above, intercepted

8   communications to and from **TT#1/SEGAL** have confirmed that Sanders SEGAL

9   operates an illegal bookmaking business out of the LUCKY LADY and regularly deals

10   with illegal sports betting websites and clients whose individual credit limits exceed

11   $10,000.  The continued interception of **TT#1/SEGAL** is necessary to further identify the

12   volume and geographic scope of SEGAL's illegal bookmaking business.  Moreover, the

13   continued interception of **TT#1/SEGAL** is necessary to further identify the manner and

14   means of the Target Subjects' money laundering activities, including the total quantities of

15   illegal gambling proceeds collected and laundered and how the illegal gambling proceeds

16   are laundered.  In addition, I believe the continued interception of **TT#1/SEGAL** is

17   necessary to gather evidence related to the potential bribery and illegal influence of City

18   of San Diego public officials by **SEGAL,** and others, and public corruption offenses

19   arising out of the Target Subjects' efforts to modify existing San Diego laws.

20              **P.**   **Need to Intercept TT#3/SPATAFORE**

21      139.  In order to meet the goals of this investigation set forth in paragraph 9 of this

22   affidavit, I believe it is necessary not only to intercept wire and electronic communications

23   to and from **TT#1/SEGAL,** but also to intercept wire communications to and from

24   **TT#3/SPATAFORE**.  As set forth above, intercepted communications to and from

25   **TT#1/SEGAL** have confirmed that Joe SPATAFORE is one of Sanders SEGAL's largest

26   betting clients.  Indeed, according to intercepted calls to and from **TT#1/SEGAL**, it

27   appears that SPATAFORE deals with illegal sports betting websites that have maximized

28

1   SPATAFORE's credit betting limit up to $150,000.00.   Furthermore, SPATAFORE also
2   has acted as bookmaker and took at least one illegal sports bet from SEGAL.   Moreover,
3   as set forth in the toll analysis related to **TT#3/SPATAFORE**, SPATAFORE is in regular
4   contact with suspected bookmakers who do not appear to communicate directly with
5   **TT#1/SEGAL**.   Accordingly, simply intercepting **TT#1/SEGAL** would be inadequate to
6   investigate the full scope of the illegal gambling operations that implicate SPATAFORE.
7   In addition, I believe it is necessary to intercept **TT#3/SPATAFORE** in order to uncover
8   the full extent of SPATAFORE's efforts to improperly influence public officials.   As
9   described in paragraph 68, during a May 13, 2015 phone call intercepted on
10  **TT#1/SEGAL**, SPATAFORE would not discuss the details of his plans to change
11  existing San Diego laws with SEGAL.   Toll records, however, show that less than two
12  minutes after this cryptic phone call had ended, SPATAFORE used **TT#3/SPATAFORE**
13  to call Imad SAMOUNA, an individual believed to have long-standing ties to illegal
14  gambling operations, and engaged in a relatively lengthy eleven-minute conversation.   As
15  set forth in paragraph 87, a variety of **TT#3/SPATAFORE**'s other contacts with
16  SAMOUNA   on   other   occasions   also   were   closely   intertwined   with
17  **TT#3/SPATAFORE**'s contacts to **TT#1/SEGAL**.   Notably, it does not appear that
18  **TT#1/SEGAL** has any direct contact with SAMOUNA.   Given SPATAFORE's
19  reluctance to discuss details with SEGAL, in combination with SPATAFORE's nearly
20  contemporaneous   contact   with   SAMOUNA,   I   believe   the   interception   of
21  **TT#3/SPATAFORE** likely will provide additional evidence related to the Target
22  Subjects' efforts to bribe or illegally influence San Diego public officials, evidence that
23  could not be obtained through interception of **TT#1/SEGAL** alone.

24                                          **VI**

25                                  **MINIMIZATION**

26       140.   The requirements regarding the minimization of intercepted communications
27  will be strictly followed.   Before interception begins, a meeting will be held for all
28  monitoring agents, and the requirements of minimization will be set forth and discussed.

LSTV-TIII-PLEAD-15MC0291-000235

1   A memorandum regarding minimization will be provided to all monitoring agents, as well
2   as a copy of the court order authorizing interceptions.  A copy of the court's order and the
3   minimization memorandum will be posted at the listening site.  Before a monitoring agent
4   begins to intercept communications, he or she will be required to sign a form indicating
5   that he or she has read the affidavit, the court's order authorizing interception, and the
6   minimization memorandum.  Through their signatures, agents will be attesting that they
7   are familiar with the contents of these documents and will only intercept communications
8   in compliance with the court's order.

9        141.  All interceptions will be minimized in accordance with Title 18, United
10  States Code, Section 2518.  Interception of wire and electronic communications will be
11  suspended immediately when it is determined through voice identification, physical
12  surveillance, or otherwise, that the Target Subjects, or any other associates, are not
13  participants in the conversation or that the conversation is personal in nature.  Agents will
14  monitor all wire and electronic communications to determine if a party to a conversation
15  is a conspirator.  Monitoring will be discontinued if, while making this identification, the
16  agents determine that the conversation does not involve the Target Subjects or is not
17  criminal in nature. If monitoring is discontinued, monitoring agents will spot check the
18  conversation to determine whether the conversation becomes criminal in nature.
19  Intercepted wire conversations will be recorded, and all recordings will be securely
20  preserved. Logs will be prepared regarding the date and time of calls, the parties involved
21  in the conversations, the subject matter of the communication, and if and when
22  minimization occurred.  Reports detailing the course of the interception will be filed with
23  the court on or about the 15th day following the commencement of interception pursuant
24  to the court's order.

25       142.  With regard to the intercepted electronic communication over the Target
26  Telephones, all monitoring of electronic communications will be conducted in accordance
27  with Chapter 119 of Title 18, United States Code.  Each electronic communication will be
28  reviewed over a secure system, and based on the identities of the sender and recipient and

LSTV-TIII-PLEAD-15MC0291-000236

the content of the message, monitoring personnel will determine as soon as practicable after interception whether the electronic communication appears to be relevant to the investigation or otherwise criminal in nature.   If the electronic communication is not criminal in nature, the electronic communication will be marked "non-pertinent." Monitoring personnel may consult with agents involved in the investigation to resolve potential uncertainties about whether a particular communication is pertinent or not.  If the electronic communication appears to be privileged, it will be marked "privileged" and secured from access.   If an electronic communication appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "pertinent."  In the event the intercepted electronic communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.  Reports detailing the course of the interception will be filed with the court on or about the 15th day following the commencement of interception pursuant to the court's order.

143.  I believe, based on past experience and the facts of this investigation, that after the first incriminating communication is intercepted, additional communications of the same type will follow since a conspiracy is an ongoing criminal enterprise which requires repeated contact and planning to succeed.  The interception of more than one such communication will be necessary in order to determine the identities of all the members in this conspiracy described in this affidavit, and obtain information regarding the extent and nature of their participation in the Criminal Activity.   Therefore, authorization to intercept wire and electronic communications should not cease upon interception of the first incriminating communication deemed as evidence of this conspiracy, but should continue until the objectives of this investigation are accomplished, not to exceed a period of thirty days.

144.  Interceptions will begin as soon as practicable after the order is signed, and all monitoring of wire and electronic communications shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception

LSTV-TIII-PLEAD-15MC0291-000237

under Chapter 119 of Title 18, United States Code. Special attention will be given to minimize all privileged communications. If a conversation is minimized, monitors shall spot check to ensure that the conversation has not turned to criminal matters. In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

145.    Wherefore, based on the facts set forth in this affidavit, and my training and experience as a law enforcement officer, I have probable cause to believe the Target Subjects have committed, are committing, and will continue to commit offenses enumerated in Title 18, United States Code, Section 2516, and that particular wire and electronic communications of the Target Subjects concerning those offenses will be obtained over **TT#1/SEGAL** and **TT#3/SPATAFORE** through court authorized interception of wire and electronic communications, as requested herein.

_Max Regula_
MAX REGULA
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this _10th_ day of July, 2015.

_Janis L. Sammartino_
HONORABLE JANIS L. SAMMARTINO
United States District Judge
Southern District Of California

88